**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Patrick Allen TURNER and Kenny Leroy White, Defendants–Appellants.**

**No. 79–5186.**

United States Court of Appeals, Fifth Circuit.

Oct. 20, 1980.

Rehearing Denied Nov. 21, 1980.

---

**462**

Edward E. Augustine, Atlanta, Ga., (Court–appointed), for Turner.

Jay Strongwater, Robert Altman, Asst. Federal Public Defenders, Atlanta Ga., for White.

William S. Sutton, Asst. U.S. Atty., Atlanta, Ga., for plaintiff–appellee.

Before INGRAHAM, RONEY and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

These two criminal cases were consolidated for trial and appeal by agreement. Defendants were convicted on charges of conspiracy to distribute a controlled substance and possession of cocaine. Their only defense was an illegal search. Defendant White's appeal asserts that if guilty, his sentence should be modified because it places an impermissible condition on his right to probation. We affirm on the basis of *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). This decision and two of the opinions implicitly approve the use of the "drug courier profile" by drug enforcement agents.

*Mendenhall* may be said to add a new dimension to the interpretation of the word "seizure" in the Fourth Amendment. The doctrine has been that a "random stop" is impermissible and evidence derived from such a seizure and/or search is inadmissible.[1] At the other end of the spectrum is

---

1. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

the doctrine that a lawful arrest will authorize a search.[2] Between the random search and the lawful arrest extremities there has developed the "investigatory stop" when "criminal activity is afoot" and then a search when consent is given or a warrant obtained. For the stop not to bar the admissibility of the evidence obtained contemporaneously, the officer must have a suspicion, based on reasonable facts, that the individual is involved in criminal activity.[3]

*Mendenhall* permits the officer to combine a series of apparently innocent acts together with empirical data into a profile to form the basis for a reasonable suspicion that the person observed is a drug courier. In that case, an airport stop and consent search were involved. At the Detroit Airport Ms. Mendenhall was the last person to exit a plane from Los Angeles, known by the Drug Enforcement Agency as a source city for illicit drugs. She appeared nervous as she entered the terminal. She walked to the incoming baggage repository but did not obtain any luggage. There she asked a porter the location of the Eastern departure gates. At an Eastern gate she secured a boarding pass for a flight to Pittsburgh, but was seen to have an American Airlines ticket. The drug enforcement agent testified that changing flights to divert surveillance was a common practice of drug couriers. Based on their observations of Ms. Mendenhall, two DEA agents approached her, identified themselves, and requested permission to see her driver's license and airplane ticket. She became nervous but acceded without objection. The ticket had a fictitious name. The agents asked if she was carrying drugs, and she replied in the negative. They asked her if she would accompany them to the DEA office in the airport, and she agreed. There she consented to a search by a policewoman, and cocaine was discovered.

In *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978), our court described the characteristics of the drug courier profile as:

(a) unusual nervousness; (b) no luggage or very limited baggage; (c) possession of an unusually large amount of cash, especially when in bills of small denominations; (d) unusual itinerary, taking circuitous routes from cities known to be source cities for narcotics, such as flying to New Orleans from Los Angeles by way of St. Louis; (e) arriving from a known narcotics source city; (f) paying for an airline ticket in currency of small denominations; (g) purchasing a one–way ticket; (h) use of an alias; (i) use of a false telephone number on an airline reservation; (j) placing a telephone call immediately upon arrival at the airport; and (k) travel by a known narcotics trafficker. *Ibid*, at 914.

In that case the evidence established that defendant's activities fit four characteristics: "he was nervous, he was traveling from a known narcotics source city, he was carrying limited luggage, and he was walking rapidly." The evidence reflected that the plane arrived from Dallas with passengers from that city as well as San Francisco and Los Angeles, the alleged source city. This court reversed the conviction because it was based on an impermissible stop.

In *Mendenhall*, Mr. Justice Stewart joined by Mr. Justice Rehnquist found that there was no seizure under the doctrine that not every stop is a seizure and that citizens may cooperate with law officials voluntarily under circumstances where consideration of the Fourth Amendment strictures need not be reached. The opinion of Mr. Justice Stewart relies on *Terry, supra,* and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968), for the proposition that as long as a citizen has a freedom of choice and willingly cooperates with an officer's investigation, there is no seizure. The conclusion of his opinion is stated on page 1877 of 100 S.Ct. as follows:

---

2. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

3. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, 392 U.S., at 19, n. 16, 88 S.Ct., at 1879, n. 16; Dunaway v. New York, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824; 3 LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. (Footnote omitted.)

Mr. Justice Powell, joined by the Chief Justice and Mr. Justice Blackmun, drew different inferences with respect to whether there was a seizure, but concluded that if there had been a seizure, the agents had reasonable suspicion that Ms. Mendenhall was engaging in criminal activity and that the stop and interrogation did not violate the Fourth Amendment. While not necessarily disagreeing with Mr. Justice Stewart's views, Mr. Justice Powell stated the following in footnote 1, page 1880 of 100 S.Ct., of his opinion: "For me, the question whether the respondent in this case reasonably could have thought she was free to 'walk away' when asked by two government agents for her driver's license and ticket is extremely close."

The three Justices concluded that the behavior of Ms. Mendenhall gave the officers reason to suspect that criminal activity was afoot, that the interrogation of her was a reasonable and modest intrusion, and that

she was not placed under any duress and was not made to feel frightened or isolated. Concluding thus that the interrogation and detention of Ms. Mendenhall by the officers were lawful under Terry, supra, and Brignoni–Ponce and Brown,[4] these three members of the court joined Justices Stewart and Rehnquist in finding that the consent for the search was voluntarily and knowingly given and that the evidence was admissible.

The minority opinion written by Mr. Justice White concluded that the stop, detention, and interrogation of Ms. Mendenhall was a seizure and unlawful because Ms. Mendenhall's behavior was not so unusual as to warrant a reasonable person to suspect criminal activity.

The Mendenhall case has been discussed in this much detail because of the similarity in facts to the present case before us and because the three opinions focus upon the legal principles which must be placed beside the facts of each case in determining whether a stop and investigation is a seizure in fourth amendment terms.

The facts in this record may be summarized as follows. On October 3, 1978, appellants deplaned at Atlanta from a nonstop flight originating in Miami. Two United States drug enforcement agents were observing the arriving passengers. One agent noticed something unnatural about appellant White's pants which restricted the normal full swing of the pants leg. The other agent noticed what appeared to be a bulge or a lump running along White's pants leg beneath the pants above the ankle.

The agents followed White and Turner through the concourse toward the exit. En route a third party, later identified as Holmes, also exiting, walked past Turner and White and turned and said something to them briefly while passing. White and Turner left the airport without claiming any luggage, and they were carrying none. Just as White and Turner left the airport in the direction of the parking lot, Holmes again walked past them. He was carrying

4. United States v. Brignoni–Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

some luggage. He said something to them in passing. White and Turner followed Holmes down the ramp leading to the long–term parking lot, remaining several paces behind. During the walk Holmes turned several times and said something to White and Turner. Throughout the walk along the ramp White and Turner stayed behind and on the opposite side of the ramp from Holmes.

Holmes arrived at a car, stored his luggage in the trunk, and was then joined by White and Turner. The two agents followed, identified themselves and stated their objective of determining whether illegal drugs were being brought through the airport. The men became noticeably nervous. Agent Markonni asked the three to present some identification. Each had a driver's license, but Holmes' airline ticket was issued to an "M. J. Miller." White and Turner said they had left their airline tickets on the plane.

The agents asked the defendants if they would consent to be searched. Holmes asked about the necessity for a search warrant. Their right to have a search warrant issued by a judge or magistrate was read to them, and they were told that if they did not consent to a search the agents would be required to go and obtain a warrant. One of the agents then turned to White who was specifically asked if he would consent to a search, and he said yes.[5] Cocaine was discovered fastened to his leg beneath his pants. All three were arrested, and later Turner was discovered to have cocaine strapped to his legs.

The foregoing summarizes the testimony of the agents at the hearing on the motion to suppress with respect to the offense at the airport on October 3, 1978. The agents also testified that about 75% of the illegal drugs coming through Atlanta originated in Miami; further, that couriers of drugs were usually without luggage and that strapping of drugs to one's legs beneath pants was a typical means of concealment.

The defendants' testimony at the suppression hearing was diametrically opposite. They said there was no attempt to disassociate themselves from Holmes on the trip to the car. They said no constitutional rights were read to them, and that they did not consent to the search.

The magistrate recommended to the district court that the motion to suppress be granted, on the issue of credibility. Upon motion of the Government, the district court conducted a de novo hearing and took testimony. The district court reviewed the magistrate's report and then denied the motion to suppress, disagreeing with the magistrate's conclusion as to credibility.

■ We have reviewed the transcript of both hearings and find that the testimony supports the trial court's findings that the stop was legal and that consent for the search was freely given. It is clear that credibility determinations and the resolution of conflicting testimony at a suppression hearing are the responsibility of the district court as trier of fact.[6] As such, the district court's finding of fact on a motion to suppress is to be examined by this court on appeal under the clearly erroneous standard of review.[7] "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ Appellants also urge that the consent to the search was involuntary and thus not constitutionally valid. Permission to search was asked. Upon the suggestion by Holmes that a search warrant was neces-

---

5. See discussion of the doctrine of valid consent, *infra*, pp. 465–466.

6. *United States v. Durham*, 587 F.2d 799, 800 (5th Cir. 1979); *United States v. Woods*, 560 F.2d 660, 663 (5th Cir. 1977); *cert. denied*, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978).

7. *United States v. Tyler*, 592 F.2d 261 (5th Cir. 1979); *United States v. Durham, supra*; *United States v. Woods, supra*; *United States v. Gunn*, 428 F.2d 1057, 1060 (5th Cir. 1970).

sary the agent read from a card, "You have the right to allow or refuse to allow a search to be made of your person and the personal property that you have with you. Do you understand?" Holmes asked further about the warrant. The agent then read further:

> Should you refuse to allow your person or property to be searched, I will contact a government attorney and attempt to obtain a search warrant. A judge or magistrate will then decide whether or not to issue a warrant.

R., Vol. III, p.51a.

Appellants argue psychological coercion or intimidation. Appellant White's brief, page 39, contains, among others, the following assertions:

> "[T]here is testimony documenting the *overbearing* conduct of the DEA agents. There were repeated requests for permission to search within a three to five minute period. The appellant along with Turner and Holmes stated they never *felt free to walk away* . . . .. In fact, the *impression* created by Markonni's explanation was that a search would be conducted . regardless of any objections they might raise. Markonni became *more and more forceful* after each inquiry by Holmes . . . .. A direct response was never given to Holmes' questions and this led to a confusing situation. In such a compacted time sequence, there never was an opportunity afforded to appellant to *calmly* consider his alternatives". (Emphasis added.)

This excerpt is given to illustrate the subjective nature of the facts relied on by appellants. Involuntary consent allegedly obtained by intimidation is a psychological state of mind that can result from a variety of subjective and objective phenomena. The state of mind depends in large degree upon the emotional stamina and the mental capacity of the person questioned. There may be preexisting fear in the mind of a person possessing illegal drugs. Subjective and objective factors operating upon the state of mind can create fear. Examples of subjective factors are intonations of voice,

facial expressions, gestures, and demeanor and personality of the officer. Objective factors can be the location of the conversation (police station or parking lot), the length and time of day of the interview, and whether the officers are armed and/or outnumber the persons questioned.

Any appellate review of alleged intimidation is a challenge. It is exceedingly difficult when the appellant relies on subjective factors, but the objective factors, as here, negate intimidation. We are asked to find that Holmes, Turner, and White did not feel free to get into Holmes' car and drive off. The officer gave warning of the necessity of consent as an alternative to his obtaining a search warrant. We cannot hold that he had in addition to counsel the freedom of choosing to drive off. We are not faced with deciding the problem that would have arisen if Holmes, White, or Turner had asked if they were free to leave and the officer had responded "No."

As stated earlier, we hold that the investigatory stop was legal, the consent to search was voluntarily given, and the seized evidence was admissible.

■ Defendant White complains that the district judge erred in attaching an impermissible condition to that part of his sentence where he is placed on probation. That portion of the sentence complained about is set forth in full with the claimed impermissible provision underlined:

> IT IS ADJUDGED that the defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of FIVE (5) YEARS, to serve SIX (6) MONTHS in a jail–type institution, to be followed by FIVE (5) YEARS SPECIAL PAROLE on each of count one and two, and that the execution of these sentences shall run concurrently, one with the other but that the execution of the balance of the imprisonment and the FIVE (5) YEARS PAROLE bé, and the same hereby is suspended until the further order of the court, and that the defendant be placed upon probation for the period of FIVE (5) YEARS with the SPECIAL

CONDITION that the defendant pay a fine in the amount of ONE THOUSAND AND NO/100 ($1,000.00) DOLLARS on terms to be arranged by the probation officer <u>and as a FURTHER CONDITION of probation he is to repay the Government all expenses advanced for travel, or otherwise, and he is to pay into the General Court Fund FIVE HUNDRED AND NO/100 ($500.00) DOLLARS as attorney fees</u>, in addition to the $75.00 payment previously made. The execution of this probated sentence shall commence to run from the expiration of, or the legal release from, the imprisonment portion of this sentence.

We note that this sentence was entered by the district court on March 30, 1979, prior to our opinion dated August 17, 1979, in *United States v. Jiminez*, 600 F.2d 1172 (5th Cir. 1979), where on pages 1174 and 1175 this court held that reimbursement of court–appointed counsel is not permitted as a condition of probation pursuant to 18 U.S.C. § 3651. The pertinent portion of that opinion from pages 1174–75 is as follows:

> The government suggests no other basis for the reimbursement imposed as a condition of probation, and we know of none. 18 U.S.C. § 3651 lists three monetary payments on which probation may be conditioned—fines, restitution to aggrieved parties, and support payments to dependents. Repayment of court–appointed counsel is not listed among these conditions. The First Circuit, in *U. S. v. Santarpio*, 560 F.2d 448, 455 (CA1), *cert. denied*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977), held that conditioning probation on repayment of court–appointed counsel is a "fine" within the meaning of § 3651. We disagree with this reading. "Fine" should be limited to monetary penalties that are provided for in criminal statutes. Moreover, the government's claim for erroneously provided legal services does not fit within the § 3651 category of "restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had . . . ."

Any loss suffered by the government was not caused "by the offense for which conviction was had." The statute seems to provide only for reparations of losses to the victims of the criminal act, *see, e. g., U. S. v. Boswell*, 565 F.2d 1338, 1343 (CA5), *cert. denied*, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978).[2] [Note [2]:] In *U. S. v. Savage*, 440 F.2d 1237 (CA5, 1971), the district court imposed as a condition of probation the requirement that the convicted defendant pay the costs of prosecution. The opinion implied that this was appropriate under the restitution clause of § 3651, but this was not an issue raised on appeal.

As can be seen by comparing the sentence to the holding in *United States v. Jiminez*, that portion of the sentence requiring payment of expenses for travel and attorney fees must be and it is hereby vacated.

The convictions are AFFIRMED, and the sentence of defendant White is modified to vacate the condition of reimbursement of expenses and attorney fees on probation.