**UNITED STATES of America, Plaintiff,**

v.

**Abbi Susan BEKOFF, Defendant.**

**No. CR–LV–81–87, HEC.**

United States District Court,
D. Nevada, S. D.

Jan. 6, 1982.

**426**

Lamond R. Mills, U. S. Atty., William C. Turner, Asst. U. S. Atty., Las Vegas, Nev., for plaintiff.

Alvin E. Entin, North Miami Beach, Fla., William B. Terry, Las Vegas, Nev., for defendant.

## DECISION

CLAIBORNE, Chief Judge.

This matter is before the Court on the Government's objections to the United States Magistrate's Findings and Recommendation, dated September 16, 1981.

Following an Indictment by the Federal Grand Jury at Las Vegas, Nevada for violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance), Defendant filed the instant Motion to Suppress her identity and the contraband seized from Defendant, without a warrant, by agents of the Drug Enforcement Administration at McCarran International Airport, Las Vegas, Nevada, on July 3, 1981. The United States Magistrate has recommended granting Defendant's Motion to Suppress.

I must now make a *de novo* determination of the Motion to Suppress, filed on behalf of Defendant Bekoff.. 28 U.S.C. § 636(b)(1)(C). Upon careful review of the transcript of the hearing before the Magistrate, along with the entire court record, I am of the opinion that further evidence and argument is unnecessary. See *Campbell v. United States Dist. Ct. for N. Dist. of Cal.*, 501 F.2d 196 (9th Cir. 1974), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119. See also *United States v. Fry*, 622 F.2d 1218 (5th Cir. 1980); *United States v. Whitmire*, 595 F.2d 1303 (5th Cir. 1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136.

## FACTS

Special Agent Dave Taketa of the Drug Enforcement Administration, Las Vegas, Nevada, testified that on July 3, 1981, he was advised by telephone call from Detective Tom Brennan of the Broward County, Florida, Sheriff's Department that an individual by the name of Abbi Bekoff had, on July 2, 1981, purchased a round trip Delta Airline first class ticket from Fort Lauderdale, Florida, to Las Vegas, Nevada, departing at 7:00 a. m. on July 3, 1981, and returning to Fort Lauderdale, Florida, on the same day with a lay-over in Las Vegas of one and one-half hours. Agent Taketa was further advised by Detective Brennan that the Defendant paid for the airline ticket with $902 in cash. Agent Taketa was further advised that the Defendant failed

to appear for the Delta flight in Fort Lauderdale at 7:00 a. m., but instead boarded a later Braniff Airlines flight to Las Vegas, which provided for a four-hour layover in Las Vegas, prior to Ms. Bekoff's return to Fort Lauderdale.

The above factors raised a suspicion in the minds of Detective Brennan and Agent Taketa that Defendant might be carrying narcotics from Fort Lauderdale, which in Agent Taketa's experience is a common source city for narcotics. As a result, Agent Taketa contacted two associates on the McCarran Airport Drug Enforcement Detail, Detective Steven Ducharme, Las Vegas Metropolitan Police Department and State Narcotics Agent John Perry, and the three proceeded to McCarran Airport where they awaited the arrival of Defendant on the Braniff flight arriving from Fort Lauderdale, Florida, at approximately 5:25 p. m.

Agent Taketa testified that while waiting in the passenger reception area at Braniff, gate # 1, he observed an unidentified female, later identified as Judy Siemens, standing in the reception area and scrutinizing other persons waiting at the gate. Although Agent Taketa did not have a complete description of Defendant from Detective Brennan, he had been advised that she was young, slender, attractive, and had long hair. Agent Taketa observed Defendant exit the plane, enter the terminal, make eye contact with Siemens, nod, and greet each other following which Defendant and Ms. Siemens proceeded in the direction of the baggage claim area of the airport. Agent Taketa also testified that Defendant and Ms. Siemens engaged in conversation as they walked to the baggage claim area, but that he could not overhear the content of their conversation.

Agent Taketa observed Defendant retrieve a suitcase from the baggage claim area, and after she cleared the baggage check gate he approached Defendant, identified himself as a Federal Agent, and asked Defendant if he could talk to her for a moment—to which Defendant replied, "sure." Agent Taketa asked to see Defendant's airline ticket and any identification which she had; following which Defendant provided Taketa with her ticket, in the name Abbi Bekoff, together with her Florida driver's license in the same name. Agent Taketa noticed at that time that Defendant's suitcase bore an initial "M" and that the address tag attached to the suitcase was blank. Agent Taketa advised the Defendant that he was checking a tip from Fort Lauderdale that the Defendant might be carrying narcotics in her suitcase and asked if she would voluntarily consent to a search of the suitcase. Agent Taketa further advised Defendant that she had a right to refuse his request to search her suitcase, and that she had the right to consult an attorney prior to deciding whether to grant consent to search the suitcase, and that Defendant could ask the agents to stop the search of the suitcase at any time after it commenced. Defendant asked how long a search of the suitcase would take and Agent Taketa responded, "a few minutes." Defendant then consented to a search of the suitcase.

Upon Defendant's consent to a search of the suitcase, Agent Taketa suggested that they proceed upstairs to a more private location away from the flow of traffic in and out of the baggage claim area, to which Defendant agreed. On the way up the stairs, Defendant asked when she would get her driver's license and airline ticket back, to which Agent Taketa responded, "as soon as the search is concluded." At the top of the stairs, Defendant opened the suitcase and permitted Agent Taketa to examine its contents following which he discovered approximately 13 ounces of cocaine secreted inside a can of baby powder. Defendant has stipulated that the contents of the can were, in fact, cocaine.

Defendant acknowledged that Agent Taketa was polite when he approached her and identified himself at the airport, but that she was a "little bit scared" because she had never been confronted by a Federal Agent before. Defendant testified that she thought she was being placed under arrest by Agent Taketa when he gave her her "rights," which she understood to be the

*Miranda* type rights she had seen given on television. Defendant further stated her conclusion that she was under arrest was reinforced by the fact that Agent Taketa kept her airline ticket and driver's license after she asked when she could have them back. Defendant testified that she gave her consent to search the suitcase because she "thought she had no choice," and that she was very aware of the presence of Detective Ducharme and State Narcotics Agent Perry during her encounter with Agent Taketa. Defendant was placed under arrest upon discovery by Agent Taketa of the 13 ounces of cocaine in the suitcase.

DISCUSSION

Defendant claims the cocaine seized at McCarran International Airport from Defendant's suitcase on July 3, 1981, must be suppressed on three grounds. First, that the initial stop of Defendant by Agent Taketa was not supported by a "reasonable and articulable suspicion" that Defendant was engaged in criminal activity. Second, even if the initial stop of Defendant was lawful, that taking the encounter past the identification check constituted an unlawful seizure of Defendant. And, third, that Defendant's consent to search the suitcase in which the cocaine was found was involuntary.

It is clear that for agents to make an arrest without a warrant, the agents must have facts within their personal knowledge that satisfy the constitutional standard of probable cause. *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). However, an investigatory stop or detention short of an arrest may also be valid if based on a "founded or reasonable suspicion that criminal activity is afoot." *United States v. Collom*, 614 F.2d 624, 628 (9th Cir. 1979). As the court stated in *United States v. Collom, supra* at 628:

> The Supreme Court has recently defined reasonable suspicion to exist when the

detaining officer is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrants suspicion" that the law is being broken. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 [95 S.Ct. 2574, 2582, 45 L.Ed.2d 607] (1975).

A more particularized standard for investigatory or "Terry" stops[1] involving a "drug courier profile" has emerged from two recent Supreme Court decisions. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), and *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

In *United States v. Mendenhall, supra*, the defendant was approached by D.E.A. agents at the Detroit Metropolitan Airport after disembarking from a commercial airline flight arriving from Los Angeles, California early in the morning. The agents approached the defendant because her conduct was characteristic of persons unlawfully carrying narcotics. The court provided the following explanation of the "drug courier profile" used by the federal agents:

> The agent testified that the respondent's behavior fit the so-called "drug courier profile"—an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs.

*Mendenhall, supra*, 100 S.Ct. at 1873, n. 1.

The agents asked Mendenhall if they could see some identification and her airline ticket, whereupon Mendenhall produced a driver's license and airline ticket. When asked why the name on the airline ticket was different from that on her driver's license, the defendant became evasive and noticeably upset. After returning the driver's license and airline ticket to Mendenhall, the agents asked her if she would accompany them upstairs to the airport D.E.A. office for further questions,[2] to which the defendant responded affirmatively. Once inside the D.E.A. office, Mendenhall con-

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. I find the returning of the identification and airline ticket *before* the defendant's consent to further questioning to be a critical factual dis-

tinction between *Mendenhall* and the case *sub judice*. Here, Defendant Bekoff's airline ticket and identification were not returned until *after* the search of her suitcase.

sented to a search of her purse and person and was found in possession of heroin.

Writing for the majority in *Mendenhall*, Justice Stewart held that no "seizure" of the defendant had taken place which would trigger Fourth Amendment protection:[3]

> We adhere to the view that a person is "seized" only when by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." (citation omitted) As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

*Mendenhall*, 100 S.Ct. at 1877.

In a concurring opinion by Justice Powell, three members of the Court assumed, as did the courts below, that the defendant had been seized, but found no Fourth Amendment violation as an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). 100 S.Ct. at 1881. Focusing on the particular expertise of the D.E.A. agents and the defendant's conduct, Justice Powell held:

> In light of all of the circumstances, I would hold that the agents possessed reasonable and articulable suspicion of criminal activity when they stopped the respondent in a public place and asked for her identification.

100 S.Ct. at 1883.

The four dissenting members of the *Mendenhall* court found that a seizure had occurred and that the agents did not have a reasonable suspicion, based on "objective facts," that the defendant was involved in criminal activity. 100 S.Ct. at 1884.

Following on the heels of *Mendenhall*, the Supreme Court announced its decision in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). The defendant in *Reid, supra,* was observed by D.E.A. agents in the Atlanta Airport as he disembarked from a commercial airline flight arriving from Ft. Lauderdale, Florida, early in the morning. The defendant was stopped, along with another suspect, and asked for his airline ticket and identification. The defendant and his companion agreed to return to the terminal and consent to a search of their persons and their shoulder bags. Upon entering the terminal, however, the defendant attempted to flee, abandoning his shoulder bag. The bag was found to contain cocaine.

Assuming the defendant had been "seized" under the Fourth Amendment, the majority in *Reid* stated (per curiam):

> The Fourth and Fourteenth Amendments' prohibition of searches and seizures that are not supported by some objective justification governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest." (citations omitted) While the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity. (citations omitted)

*Reid*, 100 S.Ct. at 2753

The Court found there were insufficient articulable facts upon which to reasonably suspect criminal activity was afoot. 100 S.Ct. at 2754. Those circumstances which the Court found insufficient to justify an investigative stop were:

---

**3.** In the district court and before the court of appeals, the parties had apparently conceded that the defendant was seized when she was asked to produce identification. 100 S.Ct. at 1875, n. 5. The majority felt it appropriate to consider the issue of seizure, although not raised below. 100 S.Ct. at 1875–76, n. 5.

... that (1) the petitioner had arrived from Ft. Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags.

*Id.* at 2753–54.

■ Reading *Mendenhall* and *Reid* together, a two-pronged test emerges in determining the propriety of a "drug courier" stop and resulting search. First, whether the initial stop constitutes a seizure within the meaning of the Fourth Amendment. *Reid,* 100 S.Ct. at 2754 (Justice Powell concurring). Once a seizure is found to have occurred, the second prong of the test is whether the law enforcement officers possessed sufficient articulable facts to reasonably suspect the defendant to be engaged in criminal activity. *Reid v. Georgia, supra; Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). If no seizure occurs, the proper focus is whether any consent to a search was in fact voluntary or the product of duress or coercion, express or implied, to be determined by the totality of all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

### I. *Seizure*

■ As stated in *Terry v. Ohio, supra :* Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred. *Terry,* 392 U.S. at 18, n. 16, 88 S.Ct. at 1879, n. 16. The proper focus in determining if a person has been "seized" within the meaning of the Fourth Amendment is whether,

"... in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 100 S.Ct. at 1877. See *United States v. Anderson,* 663 F.2d 934 (9th Cir. 1981). One need not test a reasonable conclusion that he or she is restrained by attempting to leave:

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request *might be compelled.* (citations omitted)

*Mendenhall,* 100 S.Ct. at 1877.

Presented with facts remarkably similar to the case at bar, the Ninth Circuit recently considered the question whether a woman was seized by officers stopping her in an airport and asking to see her airline ticket and some identification. *United States v. Patino,* 649 F.2d 724 (9th Cir. 1981). In *Patino, supra,* the defendant was observed by a D.E.A. agent in the Miami airport. The agent began to suspect the defendant, a woman, of engaging in illicit drug activities because she fit the "drug courier profile." The following conduct led the agent to stop Patino and ask her for some identification: 1) the defendant appeared nervous and looked around in a scanning fashion, as if to see if someone was looking for her; 2) she purchased her airline ticket with cash; and 3) defendant continued to watch her suitcase after it was placed on the conveyor belt. Based on these observations, two D.E.A. agents approached Patino, identified themselves, and asked to see her airline ticket and some identification. Patino produced an alien green card bearing the name "Dora Patino" and an airline ticket in the name of "Gloria Restrepo." Patino eventually refused to consent to a search of her suitcase and was allowed to depart on her flight to San Francisco, California. Upon arrival in San Francisco, Patino was again stopped by federal agents and eventually consented to the search of her suitcase.

The suitcase contained approximately seven pounds of cocaine.

The primary issue considered by the Ninth Circuit in *Patino* was whether the initial action of the agents in stopping the defendant and requesting her to produce her airline ticket and identification constituted a seizure within the meaning of the Fourth Amendment:

> It should be noted that we are really concerned with the initial confrontation and whether, at the time she was initially stopped and asked for her ticket and identification, she reasonably believed that she was not free to leave. After having seen the ticket and the identification, indicating that she was traveling under an assumed name, there probably were sufficient articulable facts to create a reasonable suspicion justifying a brief detention for questioning.

*Patino,* 649 F.2d at 727–728. In upholding the trial court's finding that Patino was seized when she was initially stopped and asked for identification, the Ninth Circuit noted that such a determination depends on the facts and circumstances of each case. *Id.* at 728.

■ Turning to the facts before this Court, I find that the Defendant, Abbi Bekoff, was seized within the meaning of the Fourth Amendment when Agent Taketa stopped her and asked to see her airline ticket and identification. The language in *Reid v. Georgia, supra* 100 S.Ct. at 2753, is clear: "... any curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the person seized is engaged in criminal activity. See *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357; *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660; *United States v. Brignoni-Ponce, supra; Adams v. Williams,* 407 U.S. 143, 146–149, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612; *Terry v. Ohio, supra.*" Cf. *United States v. Martell,* 654 F.2d 1356 (9th Cir. 1981).

The record supports a characterization of the Defendant as a young, attractive female who has had little contact with law enforcement officers. While walking with a female companion in an unfamiliar air terminal, the Defendant was approached by three male law enforcement officers. When Agent Taketa identified himself as a federal narcotics agent and, albeit politely, asked the Defendant if he could see her airline ticket and some identification, it was not unreasonable for Ms. Bekoff to conclude that she was not free to continue until she complied with Agent Taketa's request. As noted in *United States v. Patino, supra* at 728, the Defendant was not advised that she was under no obligation to stop and produce identification.[4]

Under the circumstances before this Court, and in light of the Defendant's background, Ms. Bekoff reasonably concluded that she must stop and produce the identification and airline ticket. This conclusion was reinforced when the Defendant was asked to consent to a search of her suitcase without the returning of her ticket and identification. This factual element was not before the court in *Mendenhall, supra,* where Mendenhall's ticket and identification were returned to her before she was requested to consent to a search. Ms. Bekoff's conclusion that she was not free to leave was further confirmed when she asked when her ticket and identification would be returned and was told they would be returned *after* the search of her luggage was completed. The logical conclusion was that the Defendant was not free to leave until her suitcase was searched.

## II. Articulable Facts

Having determined that the Defendant was seized within the meaning of the Fourth Amendment at the time she was asked to produce her airline ticket and identification, I turn now to a consideration of whether these law enforcement officers possessed sufficient articulable facts to rea-

---

**4.** This factor of a defendant not being informed he was free to go was also considered to be significant in *United States v. Hill,* 626 F.2d 429 (5th Cir. 1980). See also *Dunaway v. New York,* 422 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

sonably suspect the Defendant was engaged in criminal activity. *Reid v. Georgia, supra,* 100 S.Ct. at 2753; *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

Prior to approaching the Defendant at McCarran International Airport in Las Vegas, Agent Taketa was aware of the following information:

1. On July 2, 1981, Detective Tom Brennan in Ft. Lauderdale, Florida observed a Miss Bekoff, a young, attractive female, purchase a round trip Delta Airlines first class ticket from Ft. Lauderdale to Las Vegas and back on the same day—July 3, 1981, with a one and one-half hour layover in Las Vegas.

2. Miss Bekoff's airline ticket was purchased with $902 in cash.

3. Miss Bekoff failed to appear for the Delta flight in Ft. Lauderdale at 7:00 a. m., but instead boarded a later Braniff Airlines flight to Las Vegas, which provided for a four hour layover in Las Vegas.

4. While awaiting the arrival of Ms. Bekoff's flight at Braniff gate # 1 in Las Vegas, Agent Taketa observed a woman (Ms. Siemens) in the reception area scrutinizing other persons waiting at the gate.

5. Upon the arrival of the Braniff flight from Ft. Lauderdale, Agent Taketa observed the Defendant exit the plane, enter the terminal, make eye contact with Siemens, nod, and greet each other.

6. Defendant retrieved a suitcase from the baggage claim area which Agent Taketa believed to be too large for just a four-hour layover.

██ Any observations made by the law enforcement officers subsequent to the initial seizure of Defendant are not relevant to this inquiry. See *United States v. Patino,* 449 F.2d at 727–728. The officer's suspicion must rest solely upon those facts available to him "at the moment of the seizure." *Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868, 1888, 20 L.Ed.2d 889 (1968); *United States v. Forero-Rincon,* 626 F.2d 218, 220 (2nd Cir. 1980).

This Court is mindful of the line of cases established in the Second[5] and Fifth[6] Circuits which deal with airport stops based on a drug courier profile. It is clear from a reading of those cases that each was decided on the particular facts before the court. One such case, *United States v. Forero-Rincon,* 626 F.2d 218 (2nd Cir. 1980), warrants further consideration here.

In *United States v. Forero-Rincon, supra,* the Second Circuit provided the most definitive standard of which this Court is aware in determining whether the facts and inferences before a narcotics officer support a reasonable suspicion that someone is engaged in illicit drug activities:

We must also be guided by three criteria in determining whether the facts and inferences support a reasonable suspicion. First, Iglesias' observations must be viewed as a whole, not as discrete and separate facts. Thus, Iglesias' suspicion will be deemed reasonable so long as the composite picture supports it, even if his several observations, viewed singly, are of seemingly unexceptional behavior. *Id.* at 1343. Second, Iglesias' observations must be viewed through the eyes of an agent who, like Iglesias, is trained and experienced in discerning in ostensibly innocuous behavior the indicia of narcotics trafficking. Thus, facts that would appear wholly innocent to an untrained observer might acquire significance when

5. *United States v. Forero-Rincon,* 626 F.2d 218 (2nd Cir. 1980); *United States v. Buenventura-Ariza,* 615 F.2d 29 (2nd Cir. 1980); *United States v. Vasquez,* 612 F.2d 1338 (2nd Cir. 1979); *United States v. Vasquez-Santiago,* 602 F.2d 1069 (2nd Cir. 1979); *United States v. Price,* 599 F.2d 494 (2nd Cir. 1979); *United States v. Oates,* 560 F.2d 45 (2nd Cir. 1977).

6. *United States v. Setzer,* 654 F.2d 354 (5th Cir. 1981); *United States v. Herbst,* 641 F.2d 1161 (5th Cir. 1981); *United States v. Berry,* 636 F.2d 1075 (5th Cir. 1981); *United States v. Robinson,* 625 F.2d 1211 (5th Cir. 1980); *United States v. Hill,* 626 F.2d 429 (5th Cir. 1980); *United States v. Turner,* 628 F.2d 461 (5th Cir. 1980); *United States v. Elmore,* 595 F.2d 1036 (5th Cir. 1979).

viewed by an agent who has observed attempts to smuggle drugs and is familiar with the methods used to avoid detection. *Id.* Third, the fact that conduct is as consistent with innocence as with guilt does not preclude that conduct from supporting a reasonable suspicion of criminal activity. Not even the more stringent standards of "probable cause" and "reasonable doubt" require that conduct be consistent only with guilt. (citation omitted).

626 F.2d at 221.

The court in *Forero-Rincon, supra,* found the following to constitute articulable facts sufficient to support a reasonable suspicion that an individual was engaged in criminal activity:

1. Yepes and Forero arrived from a "source city."

2. Yepes and Forero carried identical, untagged shoulderbags.

3. Yepes and Forero conversed as they walked together out of the jetway, but they separated after Yepes' whisper, with Yepes leading the way for Forero.

4. Upon reaching the area of the security checkpoint, Yepes stopped and turned in a full circle to look about the terminal.

5. When Yepes stopped, Forero stopped also, but at such a distance as to appear separate, although the women were traveling together.

6. Yepes and Forero did not claim any baggage, although they disembarked from a flight flown mostly by tourists.

7. After walking separately through the terminal building, Yepes and Forero reunited outside. When they later re-entered the building, they resumed their single-file walk, only to abandon it again as soon as they re-exited onto the sidewalk.

8. The women were clearly expecting to be met—for they waited in an area where neither taxis nor buses loaded and Yepes constantly watched the incoming traffic—but they also continued to look back through the glass wall into the lobby.

9. Upon observing Iglesias [the D.E.A. agent], Yepes quickly whispered to Forero, and the two accelerated their pace and walked away.

*Forero-Rincon* at 222.

Conversely, in *United States v. Ballard,* 573 F.2d 913 (5th Cir. 1978), the following characteristics were found inadequate in establishing a drug courier profile which would warrant an investigative stop: 1) the defendant was nervous, 2) the defendant was traveling from a known narcotics source city, 3) the defendant was carrying limited luggage, and 4) the defendant was walking rapidly.

> [T]he elements of the courier profile that were present in this case ... do not in any significant way operate to distinguish Ballard from the general public.

*Id.* at 916.

█ In light of the above authority, I find that Agent Taketa did not possess sufficient articulable facts at the time he approached the Defendant to reasonably suspect she was engaged in criminal activity. As in *United States v. Ballard, supra* at 915, the information supplied by Detective Brennan of the airport detail in Ft. Lauderdale must be given less weight because Agent Taketa could not have been sure Ms. Bekoff was the woman described by Detective Brennan until he approached her and examined her identification. The only description Agent Taketa had of Ms. Bekoff was that she was slender, short, attractive and a white female. Although the Defendant may fit that general description, so do most other women, depending upon the eye of the beholder. Agent Taketa candidly admitted at the hearing that when the Defendant deplaned in Las Vegas, he could not positively identify her as the woman fitting the drug courier profile described by Detective Brennan. Taketa identified the Defendant by her "furtive" eye contact with Ms. Siemens who, in Agent Taketa's opinion, had been scanning the area of Braniff gate # 1. Agent Taketa also testified that the Defendant's public association

with Ms. Siemens was inconsistent with the drug courier profile.[7]

Therefore, the following factors must be at least partially discounted in assessing the reasonableness of Agent Taketa's suspicion: 1) the roundtrip itinerary with a short layover; 2) the cash purchase of the ticket; 3) the Defendant's failure to appear for the original Delta flight leaving Ft. Lauderdale; and 4) the largeness of Defendant's suitcase in light of a four-hour layover.

When Agent Taketa approached the Defendant, he was not sure the above factors applied to her. All Agent Taketa knew for sure was that the Defendant was a white female (possibly young, slender and attractive) and that she was met by a woman who appeared to be scanning the area prior to the arrival of the flight.[8]

Giving all possible deference to Agent Taketa's experience as a federal narcotics officer, including four years on the airport detail, I cannot conclude that his suspicions were reasonably founded on articulable facts and inferences derived therefrom.

### III. *Taint*

■ Having found an illegal seizure within the meaning of the Fourth Amendment, a determination must be made as to whether the evidence Defendant now seeks to suppress is tainted by the illegality. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *United States v. Patino, supra* at 729; *United States v. Chamberlin*, 644 F.2d 1262, 1268 (9th Cir. 1980).

There is no question that the initial stop of Defendant tended to "significantly direct the investigation to the evidence in question." *United States v. Cales*, 493 F.2d 1215 (9th Cir. 1975); *United States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971). Accordingly, the Motion to Suppress, filed on behalf of the Defendant,

shall be granted. An Order consistent with this Decision shall issue this day.

---

7. Agent Taketa testified that drug couriers usually try not to be identified or associated with their airport contact.

8. Agent Taketa would not have known the Defendant was arriving from a "source city" unless the Braniff flight was non-stop from Ft. Lauderdale, since she may have boarded at some other city.