**UNITED STATES of America, Appellee,**

v.

**Amparo FORERO–RINCON, Appellant.**

**No. 542, Docket 79–1304.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 11, 1979.

Decided June 16, 1980.

Arthur M. Unterman, New York City (Gould & Reimer, New York City, of counsel), for appellant.

Thomas G. Roth, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. and Harvey M. Stone, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, FEINBERG and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

Amparo Forero-Rincon appeals from her conviction, entered on August 3, 1979, in the Eastern District of New York after a jury trial, for possessing cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Forero claims that Judge Bramwell erred in denying a pre-trial motion to suppress three pounds of cocaine found in her shoulderbag by a Drug Enforcement Administration agent at La Guardia Airport. We conclude that Judge Bramwell properly refused to suppress the evidence. We therefore affirm the conviction.

## I.

This appeal presents the increasingly recurring question of the constitutionality of a warrantless "investigatory stop" of a domestic air traveler by a DEA agent monitoring arriving passengers for the purpose of detecting and stemming the flow of narcotics brought into New York City by air travel. Several such appeals have been decided in the past two years by this circuit [1] and by others,[2] and one has recently been decided by the Supreme Court.[3] The decisions of this circuit have established (1) that these stops will be deemed reasonable, and therefore constitutional even though warrantless, so long as they are minimally intrusive upon the detained traveler and are initiated only after the agent has observed specific and articulable facts to support a suspicion that the traveler is engaging in criminal activity and that the stop is immediately necessary, *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979), and (2) that the reasonableness of the agent's suspicion must be judged upon the particular facts of each case, *United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980). The facts

1. See, e. g., *United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980); *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979); *United States v. Vasquez-Santiago*, 602 F.2d 1069 (2d Cir. 1979); *United States v. Price*, 599 F.2d 494 (2d Cir. 1979); *United States v. Rico*, 594 F.2d 320 (2d Cir. 1979); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977).

2. See, e. g., *United States v. Mendenhall*, 596 F.2d 706 (6th Cir. 1979) (en banc), reversed, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (U.S.1979); *United States v. Smith*, 574 F.2d 882 (6th Cir. 1978); *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977); *United States v. Roundtree*, 596 F.2d 672 (5th Cir. 1979), cert. denied, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 96 (1979); *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979); *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978); *United States v. Chatman*, 573 F.2d 565 (9th Cir. 1977); *United States v. Scott*, 545 F.2d 38 (8th Cir. 1976), cert. denied, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977).

3. *United States v. Mendenhall, supra*, note 2. "*Mendenhall* does not control the case before us, for *Mendenhall* has no majority opinion on the question of the reasonableness of the suspicion prompting the stop. Justices Stewart and Rhenquist concluded that the DEA agents who found heroin in Mendenhall's clothing acted lawfully because they had not "seized" Mendenhall within the meaning of the Fourth Amendment and because Mendenhall had voluntarily consented to the search. Chief Justice Burger and Justices Blackmun and Powell concluded that the agents acted lawfully because, assuming that they seized Mendenhall, they had a reasonable suspicion that Mendenhall was engaging in criminal activity. Justices Brennan, White, Marshall, and Stevens concluded that Mendenhall had been unlawfully seized and had not voluntarily consented to the search."

of this case, as elicited at the suppression hearing from DEA Special Agent Alfredo Iglesias, whose testimony Judge Bramwell fully credited, are:

At approximately 4:40 p. m. on April 18, 1979, Eastern Airlines Flight 20 arrived at La Guardia Airport from Miami, Florida. Because the DEA has designated Miami as a "source city"—that is, a city from which narcotics are frequently carried into the New York City area for distribution—Iglesias, along with the ubiquitous Special Agent Whitmore,[4] positioned himself at the flight's arrival gate to observe whether the behavior of any of the arriving passengers suggested that they might be carrying narcotics. After watching about seventy passengers disembark, Iglesias noticed two women exit from the jetway into the waiting area carrying shoulderbags of identical size and color. Neither of the bags had an identification tag. As they came out of the jetway and proceeded through the waiting area to the corridor leading to the terminal's main lobby, the two women walked together and conversed. After they had walked a short distance, one of them, Gaby Ofir Yepes, moved very close to the other, Forero, and whispered to her. Yepes then accelerated her pace and moved ahead of Forero by five to ten feet. Upon observing this whisper and separation, Iglesias advised Whitmore that he would follow and continue to observe Yepes and Forero, who were then briskly walking in single-file toward the lobby.

The women walked in this manner—briskly with Forero following Yepes by five to ten feet—until Yepes reached an area near a security checkpoint, where she stopped, turned around, and looked back toward the other passengers walking from the arrival gates. When Yepes stopped, Forero slowed her pace and then stopped in front of a nearby magazine stand. Forero did not look at magazines, engage anyone in conversation, nor look about; she watched only Yepes, who, after scanning the area in a full circle, resumed walking toward the lobby. Forero then followed, five to ten feet behind.

Unlike most passengers arriving from Miami, who are usually baggage-laden tourists, Yepes and Forero did not proceed to the baggage-claim area on the lower level of the terminal. Instead, they proceeded through the lobby on the upper level, Forero following Yepes, and exited onto the sidewalk. Upon exiting, Yepes stopped, although there was no designated spot for cars, buses, or taxis to pick up passengers in that area of the upper level. When Forero had also exited, the two women stood together and both looked back through the glass wall at the people inside the lobby. They then proceeded, but now side-by-side and conversing, down the sidewalk toward the National Airlines area. As they walked, Yepes scanned both the area inside the terminal and the incoming vehicles on the upper roadway. Once in front of National Airlines, they stopped, Forero leaned against the building, Yepes paced back and forth, and they continued to converse.

After a few minutes, the women walked a bit further and re-entered the terminal building. Upon re-entering, Yepes again took the lead and walked five to ten feet ahead of Forero toward the telephone booths. While Forero used the phone, Yepes stood nearby and scanned the lobby. Forero then said something to Yepes, and again with Yepes in the lead they retraced their steps toward the exit. Yepes reached the sidewalk first, waited for Forero, and the two then proceeded together, while conversing again, back toward the Eastern Airlines area. Before reaching that area, Yepes looked behind her and saw Iglesias. She quickly said something to Forero, and the two of them began to walk rapidly away. Iglesias then stopped them.

■ We must, of course, rely solely upon these facts—"the facts available to the officer at the moment of the seizure," *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)—in judging whether Iglesias' suspicion that Yepes and Forero were trafficking in narcotics was sufficient-

---

**4.** Agent Whitmore has participated in the stops in all but one of this circuit's airport-stop cases.

ly supported to warrant the stop. However, because the reasonableness of the warrantless stop depends upon the scope of its intrusion as well as the need for its inception, *Delaware v. Prouse*, 440 U.S. 645, 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and because Forero challenges the constitutionality of the search as well as of the stop, the following facts, also elicited from Iglesias, are also relevant:

After stopping Yepes and Forero by touching Yepes on the shoulder, identifying himself as a federal narcotics agent, and displaying his credentials, Iglesias stated that he wished to ask them a few questions. Iglesias addressed the women in English, and Yepes readily understood and replied in English. Forero, however, did not understand, for she does not speak English, and she asked Yepes in Spanish whether there was some problem. Yepes responded to Forero that Iglesias was a policeman who wanted to ask some questions. Iglesias understood this exchange, because Spanish is his native language, but he did not reveal to Yepes or Forero that he understood; rather, he continued to speak in English and let Yepes translate to Forero, who had indicated that she would answer his questions.

After the woman truthfully answered Iglesias' first question—whether they had disembarked from a flight or were at the airport to meet someone—Iglesias asked them if he could see their airline tickets. Yepes produced a ticket in her name and Forero produced a ticket in the name of Robert Villanueva. Iglesias next asked them each for identification, and each produced a driver's license in her name. He then asked Yepes to inform Forero that her ticket was not in the same name as her license. Yepes did so, and then immediately explained to Iglesias that she—Yepes— had forgotten Forero's name when making the airline reservations. Simultaneously, Forero stated to Yepes that the airline had erred in the name when she—Forero—purchased the ticket. Yepes did not translate

Forero's explanation. Iglesias, however, heard, and of course understood, both statements.

Iglesias then informed the women that he had stopped and asked them these questions because it was his job to prevent the smuggling of cocaine from Miami to New York. Forero was visibly moved when Iglesias intentionally pronounced "cocaine" in his native Spanish accent; her eyes opened widely, her mouth dropped, and her face turned red. Iglesias stated that he wished to look inside their shoulderbags, but that he had no authority to do so unless they gave him permission. Yepes accurately translated this statement to Forero, who, like Yepes, indicated that Iglesias could search her bag. After looking in Yepes' bag and finding no narcotics, Iglesias again asked Forero, through Yepes' accurate translation, for permission to search her bag, and he informed her that he could not do so without her permission. Upon Forero's consent, Iglesias searched the bag and found approximately three pounds of cocaine.

## II.

The standard by which this circuit judges a warrantless seizure [5] such as Iglesias' of Yepes and Forero is by now clear: this stop will be deemed justified if (1) it can be demonstrated solely upon specific and articulable facts, and the rational inferences to be drawn therefrom, that the intrusion was based on a reasonable suspicion and was necessary, and (2) the intrusion fits within the narrow category of minimally intrusive seizures recognized in *Terry v. Ohio, supra; United States v. Vasquez, supra*, at 1342. We must also be guided by three criteria in determining whether the facts and inferences support a reasonable suspicion. First, Iglesias' observations must be viewed as a whole, not as discrete and separate facts. Thus, Iglesias' suspicion will be deemed reasonable so long as the composite picture supports it, even if his

5. The government did not argue that Iglesias did not seize Yepes and Forero. We assume *arguendo* that a seizure occurred. But see *United States v. Mendenhall, supra*, note 2, ——

U.S. at ——·——, 100 S.Ct. at 1872 (Stewart, J.) and —— n.1, 100 S.Ct. 1873, n.1 (Powell, J., concurring).

several observations, viewed singly, are of seemingly unexceptional behavior. *Id.* at 1343. Second, Iglesias' observations must be viewed through the eyes of an agent who, like Iglesias, is trained and experienced in discerning in ostensibly innocuous behavior the indicia of narcotics trafficking. Thus, facts that would appear wholly innocent to an untrained observer might acquire significance when viewed by an agent who has observed attempts to smuggle drugs and is familiar with the methods used to avoid detection. *Id.* Third, the fact that conduct is as consistent with innocence as with guilt does not preclude that conduct from supporting a reasonable suspicion of criminal activity. Not even the more stringent standards of "probable cause" and "reasonable doubt" require that conduct be consistent only with guilt. *United States v. Buenaventura-Ariza, supra,* 615 F.2d at 37 and n.15.

Iglesias' suspicion was based upon the following facts:

1. Yepes and Forero arrived from a "source city."

2. Yepes and Forero carried identical, untagged shoulderbags.

3. Yepes and Forero conversed as they walked together out of the jetway, but they separated after Yepes' whisper, with Yepes leading the way for Forero.

4. Upon reaching the area of the security checkpoint, Yepes stopped and turned in a full circle to look about the terminal.

5. When Yepes stopped, Forero stopped also, but at such a distance as to appear separate, although the women were traveling together.

6. Yepes and Forero did not claim any baggage, although they disembarked from a flight flown mostly by tourists.

7. After walking separately through the terminal building, Yepes and Forero reunited outside. When they later re-entered the building, they resumed their single-file walk, only to abandon it again as soon as they re-exited onto the sidewalk.

8. The women were clearly expecting to be met—for they waited in an area where neither taxis nor buses loaded and Yepes constantly watched the incoming traffic—but they also continued to look back through the glass wall into the lobby.

9. Upon observing Iglesias, Yepes quickly whispered to Forero, and the two accelerated their pace and walked away.

▮ Viewing these facts as a whole, together with the rational inferences to be drawn from them, we agree with Judge Bramwell's decision that Iglesias' suspicion was reasonable. The first thing to catch Iglesias' eye was that Yepes and Forero carried identical, untagged shoulderbags. While there is nothing inherently suspicious about the lack of identification tags on shoulderbags, since shoulderbags are generally carried aboard the plane and are therefore much less likely to be tagged than suitcases which are checked with the airlines and by federal regulation must be tagged, it is both obvious, and a common fact in our prior cases, that traffickers in narcotics do not put their names on the bags in which they carry their goods. *United States v. Vasquez, supra,* at 1343; *United States v. Price, supra,* 599 F.2d at 496; *United States v. Rico, supra,* 594 F.2d at 322. Thus, the lack of identification, combined with the identicalness of the shoulderbags, reasonably aroused Iglesias' curiosity and justified his decision to keep a sharp eye upon Yepes and Forero. *Cf. United States v. Price, supra,* 599 F.2d at 500 n. 7.

Iglesias then saw Yepes and Forero separate, with Yepes leading the way for Forero. This tactic of separation and single-file procession is also common to our prior cases and surely one that Iglesias recognized. *Cf. United States v. Buenaventura-Ariza, supra,* at 31; *United States v. Vasquez, supra,* at 1342; *United States v. Vasquez-Santiago, supra,* 602 F.2d at 1071. Yepes' scanning in a complete circle, which Iglesias could infer was for the purpose of seeing whether they were being observed, also reasonably contributed to Iglesias' suspicion, *cf. United States v. Vasquez, supra,* at 1342–43; *United States v. Vasquez-Santiago, supra,* 602 F.2d at 1071, especially when

it was in the area of the security checkpoint, where security personnel are stationed, that she stopped to scan. Forero's stopping nearby and her intent watching of Yepes—that is, her clear attempt to keep Yepes in sight and yet not appear to be Yepes' companion—also increased Iglesias' suspicion, for he had seen them disembark together. *Cf. United States v. Oates*, 560 F.2d at 60. When Iglesias observed Yepes and Forero reunite outside the terminal, only to separate again when they re-entered the building, and all the while to continue to scan the lobby area, he could reasonably suspect that they felt apprehensive of being seen. Finally, when Iglesias observed the women accelerate their pace immediately after seeing him, he could reasonably infer that Yepes and Forero had something to hide. These facts and inferences, viewed as a whole along with the fact that Yepes and Forero had just arrived from a source city, justified Iglesias' reasonable suspicion that the women were trafficking in narcotics.

The actions of Yepes and Forero observed by Iglesias clearly were more suspicious than those reviewed in this circuit's last airport-stop case, *United States v. Buenaventura-Ariza, supra*, where the denial of the suppression motion and the conviction were reversed. In *Buenaventura-Ariza*, Jorge Buenaventura-Ariza and Delores Quiroz were observed to converse as they left a plane that had arrived from Miami, but then to separate as they walked through the terminal, Buenaventura following Quiroz by about fifteen paces and appearing to try to keep Quiroz in view while also glancing about. Quiroz paused before stepping onto the escalator down to the baggage-claim area; Buenaventura paused at the escalator also and allowed several people to pass him before he stepped onto the escalator himself. Once at the lower level, Quiroz walked straight to the baggage-claim area. While awaiting her bags, she appeared nervous and frustrated. Buenaventura milled about outside the area. After receiving her baggage, Quiroz proceeded outside the terminal building to a taxi stand, where Buenaventura joined her and resumed conversation. At that point the

agents stopped them, and in the ensuing search discovered cocaine. We held that the stop was illegal.

The behavior of Yepes and Forero, while similar in some particulars to that of Buenaventura and Quiroz, included additional suspicious actions and, when viewed as a whole, it was even more suggestive of narcotics trafficking. Like Buenaventura and Quiroz, Yepes and Forero arrived from a source city, disembarked conversing, and then separated. However, Yepes and Forero disembarked carrying identical, untagged shoulderbags, and their separation was prompted by a whisper. Once separated, like Buenaventura behind Quiroz, Forero followed Yepes. However, while Buenaventura was observed to glance about as he walked, Yepes stopped and turned in full circle to look at those around her.

The similarity between Buenaventura and Quiroz's behavior and Yepes and Forero's ends at the point that Buenaventura and Quiroz took the escalator to the lower level baggage-claim area. That Yepes and Forero carried no baggage other than the shoulderbags on what is generally a tourist flight adds another observation beyond the facts in *Buenaventura-Ariza*. The two couple's behavior differs in another significant detail as well: Buenaventura and Quiroz separated upon entering the terminal and remained separated until Buenaventura joined Quiroz at the taxi-stand. While Buenaventura was observed to attempt to keep Quiroz in view as they walked, nothing in *Buenaventura-Ariza* indicates that Buenaventura and Quiroz, rather than actually being separate travelers, were merely attempting to appear separate, for nothing indicates that Quiroz even knew that Buenaventura was following her. (Compare *United States v. Vasquez-Santiago, supra*, 602 F.2d at 1071, where, after disembarking together and separating, the appellants exchanged hand signals, or *United States v. Vasquez, supra*, at 1343, where, although standing apart in the baggage-claim area, the appellants frequently made eye-contact.) In this case, however, it is beyond question that Yepes and Forero, although

together, wished to appear separate at least while they were inside the terminal, for they rejoined when they exited the building, separated again when they re-entered, and rejoined again only when they re-exited. Unlike Buenaventura and Quiroz, Yepes and Forero were clearly acting in concert to disguise the fact that they were together.

Finally, when Yepes detected Iglesias' surveillance, she again whispered to Forero and the two accelerated their pace in flight. Along with the arrival from a source city, the identical, untagged shoulderbags, Yepes' first furtive whisper, the complete turn in observation, and the concerted attempt to appear separate, this attempt to avoid Iglesias provided Iglesias with more than the "subjective hunch" held by the agent in *Buenaventura-Ariza, supra,* at 37.

Thus, Iglesias' decision to stop Yepes and Forero based upon his suspicion of criminal activity was reasonable, for their departure from the airport was clearly imminent and their suspected offense was a serious one. *United States v. Vasquez, supra,* at 1342. Therefore, so long as Iglesias' stop was not more than minimally intrusive upon Forero, it was within the Fourth Amendment bounds of a reasonable seizure. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), *Terry v. Ohio, supra.*

This stop was clearly only minimally intrusive. It lasted only five to ten minutes and occurred in a public place. There is no suggestion that Iglesias intimidated, harassed, or humiliated Yepes or Forero. The stop was entirely reasonable.

### III.

Forero challenges the denial of her suppression motion on a second ground as well: that she did not consent to Iglesias' search of her shoulderbag and that the warrantless search was therefore unconstitutional. She argues that she did not fully comprehend what was happening when Iglesias stopped her and Yepes, since she does not speak English, and that she merely followed Yepes' example in allowing Iglesias to look through her bag. Such uncomprehending

acquiescence, she claims, does not amount to the voluntary consent required by *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Whether Forero's consent was voluntary, or was mere acquiescence to authority or submission to coercion, is a question of fact to be determined by the district court from the totality of all the circumstances. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047. We will not upset the district court's finding unless it is clearly erroneous, *United States v. Vasquez, supra,* at 1347, which Judge Bramwell's finding is not. Each of Iglesias' questions and his twice-repeated request for consent to search was translated to Forero by Yepes. With his fluency in Spanish, Iglesias ascertained that Yepes translated correctly and he understood Forero's replies. Iglesias' questioning lasted only a few minutes, its tone was conversational, and it occurred in a public place. *Cf. United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Price,* 599 F.2d at 503. Iglesias made no threats, nor displayed any weapons or other show of force. Forero has not disputed any part of Iglesias' recounting of the stop or search. The district court properly denied her motion to suppress the evidence on this ground.

### IV.

Because neither the stop nor the search violated Forero's Fourth Amendment right against unreasonable searches and seizures, we find no error in the denial of the suppression motion and we affirm the conviction.

FEINBERG, Circuit Judge (dissenting):

I dissent because I am unable to distinguish this case from *United States v. Buenaventura-Ariza,* 615 F.2d 29 (2d Cir. 1980), where the panel, in a thorough opinion by Judge Timbers, held on substantially similar facts that an investigative stop was illegal. The majority opinion here analyzes the facts in this case and the alleged differ-

ences from the facts in *Buenaventura-Ariza* at such inordinate length that it might be enough merely to observe that the majority "doth protest too much, methinks." But it is also worth noting that the distinctions that are offered to justify the inconsistent results in the two cases turn out to be these: (1) In this case, appellant and Yepes carried "identical, untagged shoulderbags," while the pair in *Buenaventura-Ariza* did not; (2) appellant and Yepes whispered before they separated, while the pair in *Buenaventura-Ariza* merely conversed; (3) Yepes, while walking ahead, "stopped and turned in full circle to look at those around her," while Buenaventura, while walking behind, merely "glance[d] about as he walked"; and (4) appellant and Yepes made a "concerted attempt to appear separate," while the pair in *Buenaventura-Ariza* did not. The first three of these purported distinctions in the facts are too unimportant to merit a difference in legal result. The fourth alleged factual difference is more significant but not enough to justify the difference in result.[1] We noted in *Buenaventura-Ariza* that the line between investigatory stops based on reasonable suspicion and stops based on the subjective hunches of experienced agents is by no means clear. But, if undue reliance is placed upon an agent's "perception" or "interpretation" of observed conduct, then the requirement of specific, objective facts may easily be circumvented. In this case, as in *Buenaventura-Ariza*, the line has been crossed. I would reverse the judgment of the district court.

---

1. The majority, presumably to show appellant's nervousness, also relies on the "attempt" by appellant and Yepes "to avoid Iglesias." But the facts in *Buenaventura-Ariza* in this regard were quite similar, since we noted that the pair in that case "seemed to be nervous." We stated there, however, that:

There must be other objective facts which, when viewed in conjunction with nervous behavior and arrival from a source city, raise the complex of conduct to a level justifying reasonable suspicion of criminal activity. Id. at 36 (footnote omitted).