**UNITED STATES of America, Appellee,**

v.

**Nelly Pilar RAMIREZ–CIFUENTES, Appellant.**

**No. 1043, Docket 82–1023.**

United States Court of Appeals, Second Circuit.

Argued May 5, 1982.

Decided June 21, 1982.

Richard R. Leff, New York City, for appellant.

Robert Stolz, Asst. U. S. Atty. for the E. D. N. Y., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., E. D. N. Y., Vivian Shevitz, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, KAUFMAN and PIERCE, Circuit Judges.

KAUFMAN, Circuit Judge:

Almost a century ago, Justice Gray eloquently captured the essence of the Fourth Amendment's guarantees when he noted that "[n]o right ... is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." [1] Courts accordingly have proceeded with caution when determining whether the interaction of a law enforcement official with the freedoms of an individual offends the Fourth Amendment. With increasing recurrence, we have considered the delicate balance which must be struck between the interest of the public in terminating narcotics smuggling and the individual's right to live unburdened by unreasonable intrusions on his privacy as we are called upon to assess the constitutionality of a warrantless "investigatory stop" of domestic air passengers by Drug Enforcement Administration agents struggling to stem the flood of dangerous drugs.

---

1. *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891).

Today we are asked once again to determine whether a warrantless airport stop and search initiated to apprehend a narcotics courier falls within constitutionally permissible bounds. Nelly Pilar Ramirez-Cifuentes was stopped and briefly questioned by Drug Enforcement Administration Agent Alfredo Iglesias at LaGuardia Airport as part of the Drug Enforcement Administration's program to intercept illegal drugs. The subsequent search of her black shoulder bag revealed 540 grams of 93 percent pure cocaine. After a hearing, Judge Platt denied her motion to suppress the cocaine and certain statements she had made to Agent Iglesias. Ms. Ramirez-Cifuentes then entered a plea of guilty [2] to possessing cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1).[3] She now would have us determine that the district court improperly denied her motion to suppress the evidence because the cocaine was taken from her as a result of an unconstitutional investigatory stop and search in the course of which the seizure occurred. Because we find Judge Platt correctly denied the suppression motion, we affirm the judgment of conviction.

### I

At the suppression hearing before Judge Platt, the familiar scenario of surveillance and encounter unfolded. On the evening of June 16, 1981, Drug Enforcement Administration ("DEA") Agents Alfredo Iglesias and Jesse Meekins were stationed at LaGuardia Airport in New York as part of the DEA's endeavors to monitor passengers on flights from certain "source cities" to control the flow of illegal drugs. Agents Iglesias, who had six years' experience with the DEA, and Meekins were awaiting the arrival of Eastern Airlines Flight 28, non-stop from Miami, a well-known source city, to New York to observe the passengers as

they left the aircraft. They positioned themselves opposite Gates 33 and 34A in the Eastern Airlines Terminal so that they would have an unobstructed view of the faces and demeanor of the arriving passengers. At approximately 9:30 P.M., Flight 28 parked at the gate, and the passengers began to disembark and walk into the concourse. In the first group to emerge from the gate was appellant Ramirez-Cifuentes.

As Ms. Ramirez-Cifuentes entered the concourse that leads from the gate to the main terminal, she continually glanced about as if looking for someone or something. The agents' attention was attracted to her because this was a limited access area in which it would be unusual for a passenger to be searching for someone meeting her, and, in addition, she was the only passenger Agent Iglesias could see engaging in such conduct. The agents followed her movements as she proceeded rapidly down the concourse, constantly turning her head to peer back toward the gate. As she walked quickly and vigorously, passing the normal flow of traffic, she looked once again in the direction of the agents, turned her head down, accelerated her gait, and pressed forward through the crowd. As the agents watched her progress, they noticed she was carrying two bags—a small aqua blue woman's purse with a shoulder strap on her left shoulder as well as a round, soft black shoulder bag on her right. The black shoulder bag, which appeared to be new and filled to capacity, bore no identification tags and was clutched tightly to her body. At this point, Agent Iglesias, suspicious of Ms. Ramirez-Cifuentes's conduct because it resembled the actions of narcotics traffickers he had apprehended during his years of experience, began to follow her down the concourse. Agent Meekins remained at the gate.

---

**2.** Ms. Ramirez-Cifuentes's guilty plea was entered pursuant to an agreement between appellant and the Government preserving her right to appeal the district court's denial of her motion to suppress.

**3.** 21 U.S.C. § 841 provides in pertinent part:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

. . . .

Walking very rapidly, almost running, to reach a place ten or fifteen feet behind her, Agent Iglesias continued to note her quick pace. He also observed that as she passed the security area, which was on the left side of the corridor, she took pains to stay far to the right. In addition, as she continued down the block-long corridor, an elderly woman approached her and asked, in Spanish, whether Ms. Ramirez-Cifuentes had been on the flight from Miami. Ignoring the question, she sped toward the end of the concourse, descended on an escalator, passed through the baggage area, claiming no luggage, and went out to the street. With Agent Iglesias still watching through the glass wall of the terminal, she turned, looked back into the building, and stared directly at him. She then joined a taxi line and repeatedly glanced about as if searching for someone.

After considering the import of his observations, Agent Iglesias left the building and approached Ms. Ramirez-Cifuentes on the taxi line. He immediately identified himself as a federal agent and displayed his badge. After ascertaining that her native tongue was Spanish, the agent, who is fluent in that language, repeated his statements in Spanish. He stated he would like to ask her a few questions and proceeded to do so as he walked with her in the line as it advanced. After determining Ms. Ramirez-Cifuentes had just arrived from Miami, he asked her to show him her airline ticket receipt. After rummaging through her bag, she produced a copy of a one-way ticket issued earlier that day by a travel agency, for cash, in the name of Rosa Gomez. Agent Iglesias examined the ticket and asked Ms. Ramirez-Cifuentes her name. She appeared startled by his inquiry and commenced looking about. Then, after some hesitation, she replied her name was Rosa Gomez. When identification was requested, she responded that she must have left it at home and added she did not even have her social security card.[4]

With this information now before him, Agent Iglesias asked if she would mind stepping out of line so they could continue the conversation unimpeded by the moving queue, and she agreed. Several steps away but still on the sidewalk, Ms. Ramirez-Cifuentes answered, in reply to the agent's question, that she had no drugs. In response to his request to search the black shoulder bag, she said "sure" and opened a zipper on the bag. The agent, however, believing it the wiser course to conduct the search away from the flow of traffic, suggested they move to an area a few feet away inside the terminal in front of the Eastern Airlines baggage area. She then followed Agent Iglesias into the building. Once inside, he again requested permission to search the bag and she once more consented. The search revealed a gift-wrapped package, tightly secured with tape, but with no ribbons or card attached. When asked what was in the parcel, appellant asserted it contained only items of clothing purchased as a gift for a friend.

To Agent Iglesias, however, the answer did not ring true because the package felt too heavy for such contents. Moreover, during this conversation, his suspicions were further aroused by Ms. Ramirez-Cifuentes's nervous demeanor. Indeed, at the suppression hearing he characterized her as "very nervous, extremely nervous. Her hands were shaking, her legs were shaking." Accordingly, he told her he wished to unwrap the parcel. Contradicting her previous statement about the package, she, according to the agent's testimony, stated: "Well, you have my permission but you can imagine what the person that gave me this box is going to think." After attempting to dispel the confusion created by the conflicting explanations of the parcel through further inquiry, Agent Iglesias requested and appellant gave her consent to opening the package so long as the agent did not damage the gift-wrapping. After carefully unwrapping the box, he discovered approximately 540 grams of 93 percent pure cocaine.

**4.** According to Agent Iglesias, the reference to a social security card is a common reply given by illegal aliens. His suspicions were proven correct because appellant is indeed an illegal alien.

Ms. Ramirez-Cifuentes was immediately arrested and given *Miranda* warnings. Indicating she understood, she related the events leading to the transportation of the package from Miami. In the main, she stated that she had been paid $500 to carry the parcel to New York.

Subsequently, she was charged with possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). She pleaded not guilty and requested suppression of certain statements as well as the cocaine on the grounds that the seizure of that evidence stemmed from violations of her Fourth Amendment rights. After a hearing, Judge Platt denied the motion to suppress. Ms. Ramirez-Cifuentes then entered a plea of guilty and was sentenced to three years imprisonment and a lifetime special parole term. This appeal followed.

## II

Ms. Ramirez-Cifuentes urges us to conclude that Agent Iglesias had neither probable cause nor reasonable suspicion for approaching and questioning her as she waited on the taxi line. In addition, she contends her consent to the search of her black shoulder bag was not voluntary. Accordingly, appellant would have us hold that the 540 grams of cocaine discovered in the shoulder bag should have been suppressed. We cannot agree.

### A.

In the course of the past few years, this Court has examined a number of challenges to the admissibility of evidence seized by DEA agents who have stopped suspected narcotics couriers arriving at LaGuardia Airport and secured their consent to conducting a search. The standards by which we assess a warrantless investigatory stop and related seizure are as clear, *see United States v. Forero-Rincon*, 626 F.2d 218, 221 (2d Cir. 1980), and as familiar as the circumstances and actions which culminate in these encounters.

While the Fourth Amendment prohibits only those searches and seizures which are not reasonable, *see Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the seizure of a person or his effects is generally considered per se "unreasonable" unless a warrant has been obtained from a neutral magistrate upon a showing of probable cause. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Recognizing that the exigencies of a particular situation would make it difficult if not impossible to procure a warrant, rare exceptions to this requirement have been spelled out such as the "automobile exception," *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), or border patrol stops based on reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

The investigative stop in the case before us does not entail "the kind of intrusion involved in an arrest," *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979), but rather fits within the narrowly circumscribed class of less intrusive stops first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry, supra*, Chief Justice Warren, writing for the Court, set forth the now well-recognized precept that a law enforcement official, given appropriate circumstances, may approach an individual acting in a suspicious manner if the investigative stop is based on facts that generate a "reasonable suspicion" that the individual is engaged in criminal activity. The plethora of airport-search cases decided by this Court have relied on the teachings of *Terry* in evaluating whether, at the moment of the initial encounter between the officer and the suspected drug courier, on the basis of specific and articulable facts and the rational inferences to be drawn from them, the intrusion was based on reasonable suspicion. *See, e.g., United States v. Forero-Rincon, supra; United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980); *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *United States v. Vasquez-Santiago*, 602 F.2d 1069 (2d Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct.

2998, 64 L.Ed.2d 861 (1980); *United States v. Price*, 599 F.2d 494 (2d Cir. 1979); *United States v. Rico*, 594 F.2d 320 (2d Cir. 1979); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977).

We are further guided in our analysis by several well-established principles. In considering whether the facts and inferences support a reasonable suspicion, we must view Agent Iglesias's observations as a whole, not as single, disconnected occurrences. In sum, we view the whole mosaic rather than each tile. *United States v. Vasquez, supra*, 612 F.2d at 1343. Thus, the agent's suspicion will be reasonable if the conduct as a whole would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer. *United States v. Oates, supra*, 560 F.2d at 61. Furthermore, although the conduct may be as consistent with guilt as with innocence, it may still indicate possible illicit activity and form the foundation for a valid stop. *United States v. Vasquez, supra*, at 612 F.2d at 1343.

■ Viewing the facts as a whole, as well as the rational inferences to be drawn from them, we agree with Judge Platt that Agent Iglesias's suspicion was reasonable and that the initial investigatory stop was justified.[5] Ms. Ramirez-Cifuentes arrived from Miami, a known "source city" for narcotics. *See United States v. Forero-Rincon, supra*, 626 F.2d at 222. As she disembarked from the aircraft, the agents' attention was attracted by her nervous demeanor and her constant glancing about. *See United States v. Vasquez-Santiago, supra*, 602 F.2d at 1072. As she walked rapidly through the limited access area where it would be unusual to search for someone meeting her, she peered back repeatedly toward the gate, as if she were in fear of being followed. *See United States v. Vasquez, supra*, 612

F.2d at 1342. The agents then noticed that appellant was carrying, in addition to a small purse, an untagged black shoulder bag which appeared to be new and filled to capacity. Granted, the lack of an identification tag on a shoulder bag may not appear to be worthy of note to the untrained eye because such bags are frequently carried onto the airplane and are often untagged. It is a common factor in our prior airport cases, however, that drug couriers do not place their names upon the bags in which they carry contraband. *See United States v. Forero-Rincon, supra*, 626 F.2d at 222; *United States v. Vasquez, supra*, 612 F.2d at 1343; *United States v. Price, supra*, 599 F.2d at 496; *United States v. Rico, supra*, 594 F.2d at 322.

The agent's curiosity aroused because Ms. Ramirez-Cifuentes's apprehension and pattern of behavior resembled the conduct of narcotics traffickers he had observed during his years of experience, Iglesias began to follow her on her vigorously-paced journey toward the terminal exit. As she kept up her hurried gait, she brushed by an elderly woman who inquired in Spanish whether she had been on the Miami flight as if a delay, the agent could infer, might increase her chance of being intercepted. His suspicions could have been increased as appellant, when passing the security area on the left side of the corridor, carefully stayed far to the right. When Agent Iglesias noted that she, after claiming no baggage and leaving the terminal, stared directly back into the building and continued intently watching the area and people about her as she stood in the taxi line, he could deduce that she felt uneasy about being seen and could be hiding something. These actions and inferences, taken as a whole, and given Agent Iglesias's expertise in monitoring airports for drug couriers, clearly justified the agent's reasonable suspicion that Ms. Ra-

5. Judge Platt noted in his opinion of November 20, 1981 that "a law enforcement officer may speak with anyone he wishes and, as long as that person's freedom of movement is not restrained in any way whatsoever, the Fourth Amendment is not implicated at all." Recognizing that we have not adopted this approach to determining the constitutionality of an investigatory stop, he proceeded to evaluate the permissibility of the stop in terms of the standard we have repeatedly employed—whether the initial encounter was based on reasonable suspicion.

mirez-Cifuentes was engaged in transporting contraband. Accordingly, the initiation of the stop was not unreasonable.

■ Nor was the scope of the intrusion excessive. In reaching our determination, we are mindful that the fundamental purpose of the Fourth Amendment is to protect, through the imposition of a standard of reasonableness on law enforcement agents, the privacy and security of all citizens against arbitrary invasion. Justice White, writing for the Court, explained that

the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this is probable cause or a less stringent test.

*Delaware v. Prouse, supra,* 440 U.S. at 654, 99 S.Ct. at 1396 (footnotes omitted). Indeed, in the multitude of airport cases which have come before us, we have been cognizant of this delicate balance and have carefully measured the need for the stop against the nature of the intrusion suffered. *See, e.g., United States v. Vasquez, supra,* 612 F.2d at 1343–44; *United States v. Price, supra,* 599 F.2d at 499.

Here, the serious nature of cocaine trafficking and imminent departure of the suspected courier are factors augmenting the need for a stop. *See United States v. Vasquez, supra,* 612 F.2d at 1342; *United States v. Vasquez-Santiago, supra,* 602 F.2d at 1073; *United States v. Oates, supra,* 560 F.2d at 59. Furthermore, we are presented with no evidence of physical restraint, harassment, or intimidation. *See United*

*States v. Vasquez, supra,* 612 F.2d 1343; *United States v. Price, supra,* 599 F.2d at 502; *United States v. Magda,* 547 F.2d 756, 759 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977). After Agent Iglesias identified himself and determined Spanish was Ms. Ramirez-Cifuentes's native tongue, he politely repeated his statements in that language and stated he would like to ask her several questions. As he walked with her while the taxi queue moved forward, he asked to see her plane ticket, and after examining it and discovering it had been purchased for cash in the name of Rosa Gomez, requested identification. We have countenanced requests such as these with frequency. *See, e.g., United States v. Forero-Rincon, supra; United States v. Vasquez, supra.* When appellant could produce no identification and appeared increasingly apprehensive, Agent Iglesias asked if she would mind stepping out of line so that they could continue the conversation with greater ease. Only a few steps away from the queue and still on the sidewalk, he then inquired about drugs and requested permission to open the shoulder bag. The stop lasted but a brief time and was conducted in a public place. Clearly, this encounter cannot be termed anything other than minimally intrusive.

The Government, however, while agreeing that the stop was grounded in specific articulable facts, and was a most minor disturbance, would have us depart from the clear well-established standard by which this Court judges these so-called airport stops. Rather than proceeding by analyzing what we have deemed "seizures" in accord with the principles of reasonable suspicion and minimal intrusion, the Government invites us to rule that the conduct of Agent Iglesias in approaching Ms. Ramirez-Cifuentes was not a seizure at all.[6] We

---

**6.** We are not unaware of possible authority for this position. In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), a case involving an investigatory stop at an airport, Justices Stewart and Rehnquist concluded that the initial encounter of the Drug Enforcement Administration agents with Ms. Mendenhall did not constitute a "seizure" with-

in the meaning of the Fourth Amendment. Chief Justice Burger and Justices Blackmun and Powell, however, determined that the agents had acted properly because, assuming they had seized Ms. Mendenhall, they had reasonable suspicion that she was engaged in illegal activity. Justices Brennan, White, Marshall, and Stevens dissented stating that she

decline the invitation. Since the stop was completely justified by an application of the principles of our traditional standard, we see no need to reach beyond them in the circumstances here. Such an extension, we believe, would only create unwarranted confusion.

### B.

■ Ms. Ramirez-Cifuentes challenges the district court's denial of her suppression motion on an additional ground: she contends that she did not consent to Agent Iglesias's search of her shoulder bag. Whether appellant's consent was voluntary, or was the product of coercion, is a question of fact to be determined by the district court after carefully considering the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Judge Platt found no threatening conduct on the part of Agent Iglesias and gave credit to the agent's testimony that appellant had twice given her consent to the search of her bag. In addition, when the search revealed a tightly-wrapped parcel which was too heavy to contain items of clothing as appellant had claimed, the agent asked to open the package, and Ms. Ramirez-Cifuentes gave her permission. Moreover, the search was conducted in a public place, an airline terminal, only a short distance from the taxi line where appellant was initially stopped. Since the district court's finding that consent was voluntary is not clearly erroneous, Judge Platt's denial of the motion to suppress must stand. *See United*

States v. Forero-Rincon, *supra*, 626 F.2d at 224; *United States v. Vasquez*, *supra*, 612 F.2d at 1347.

In sum, we conclude, by applying the standard established by our prior decisions, that the stop at LaGuardia Airport was grounded on specific and articulable facts which justified a reasonable suspicion that appellant was engaging in illegal narcotics transportation. Furthermore, it was brief and minimally intrusive. Given the compelling interest in deterring the flow of controlled substances which affect the health and well-being of the citizens of our Nation, and the elusive nature of trafficking in narcotics, the stop was necessary. Because neither the stop nor the search violated Ms. Ramirez-Cifuentes's Fourth Amendment right against unreasonable searches and seizures, Judge Platt properly denied the motion to suppress. Accordingly, we affirm the judgment of conviction.

LUMBARD, Circuit Judge, concurring:

In *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), Justice Stewart (joined by Justice Rehnquist) asserted that questioning by a law enforcement agent does not constitute a "seizure" under the Fourth Amendment unless "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), filed only five weeks later, Justice Powell (joined by the Chief Justice and Justice Blackmun) indicated that it was still an

---

had been unlawfully seized. Since there is no majority opinion, *Mendenhall* provides us with little guidance. Nor do we find that *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), another airport stop case, in which the Court ruled that a seizure was unsupported by reasonable suspicion when grounded primarily on a drug courier profile, clarifies the situation. Indeed, the Court does not appear to have considered explicitly whether a seizure occurred at the initial encounter. Moreover, the concurring opinion by Justice Powell, joined by the Chief Justice and Justice Blackmun, pointed out that the Court had not addressed this issue. *See id.* at 442–43, 100 S.Ct. at 2754.

We recognize that several other Circuits have attempted to draw the line between encounters which do not implicate Fourth Amendment concerns and those which do. *See, e.g., United States v. Berry*, 670 F.2d 583 (5th Cir. 1982) (en banc); *United States v. Wylie*, 569 F.2d 62 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). We decline to follow their example, however, because we believe the stop in the instant case was clearly justified by the standard this Court has consistently applied. Thus, no purpose would be served by marking boundaries where none need to be inscribed.

open question whether a "stop for routine identification questioning constituted a seizure...." 448 U.S. at 443, 100 S.Ct. at 2754–55 (Powell, J., concurring). Finding Justice Stewart's analysis most consistent with the Court's prior cases, I would adopt it to airport questioning of arriving passengers and affirm the judgment of conviction on that basis.[1]

Until the Court decided *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it was unclear whether the Fourth Amendment applied at all to police-citizen encounters short of a full-fledged arrest or search.[2] *See generally* 3 W. LaFave, Search and Seizure § 9.1, at 2–7 (1978). In *Terry*, the Court held that the Fourth Amendment required articulable and reasonable grounds for suspicion before a police officer could frisk a suspect in a street encounter. However, the majority and concurring opinions recognized that the Fourth Amendment's ban against unreasonable seizures does not apply to police questioning in street encounters unless the officer has in some way restrained the liberty of the person being questioned.

Focusing on the frisk of the petitioner, the majority did not address the question whether reasonable suspicion was required before an officer could "seize" a suspect "for purposes of 'detention' and/or interrogation." 392 U.S. at 19 n.16, 88 S.Ct. at 1878 n.16. It did note, however, that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* Finding insufficient evidence in the record to determine whether the petitioner's liber-

ty had been restrained prior to the frisk, the court held that a search and seizure took place when the officer grabbed the petitioner and patted down his coat for weapons.

Justice Harlan, in a separate concurrence, objected that the Court could not consider the lawfulness of the frisk without first considering the lawfulness of the interrogation. Before the officer was justified in frisking a suspect, he must have constitutional grounds to insist that the suspect stand and answer questions. The officer "must first have a right not to avoid [the suspect] but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection." 392 U.S. at 32–33, 88 S.Ct. 1885–86 (Harlan, J., concurring).

Justice White also wrote separately to address the question of interrogation in street encounters. He found no warrant in the Fourth Amendment for restraining a police officer's liberty to approach people on the street and ask them questions: "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way." 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring).

Indeed, most of the commentators writing before *Terry* was decided assumed that the Fourth Amendment did not apply to non-coercive police questioning in street encounters. *E.g.*, Bator & Vorenberg, *Arrest,*

---

**1.** A number of other courts have recently adopted Justice Stewart's test in *Mendenhall*. *E.g.*, *United States v. Black*, 675 F.2d 129 (7th Cir. 1982); *Gomez v. Turner*, 672 F.2d 134 (D.C. Cir. 1982); *United States v. Berry*, 670 F.2d 583 (5th Cir. 1982) (en banc); *Login v. State*, 394 So.2d 183 (Fla.App.1981); *State v. Harlan*, 301 N.W.2d 717 (Iowa 1981).

**2.** "There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police con-

duct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology." *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877.

*Detention, Interrogation and the Right to Counsel: Basic Problems and Possible Legislative Solutions*, 66 Colum.L.Rev. 62, 64–65 (1966); Souris, *Stop and Frisk or Arrest and Search—The Use and Misuse of Euphemisms*, 57 J.Crim.L.C. & P.S. 251, 256 (1966). The issue as they saw it was the extent of police authority under the Fourth Amendment to detain a suspect for further questioning if he refused to answer questions voluntarily. *Id.*

Nothing done by the Court since *Terry* has undermined the principles set forth there. The Fourth Amendment's bar against unreasonable seizures simply does not apply unless a law enforcement officer has in some way restrained the liberty of the person questioned. I take it that the majority does not disagree with this principle. Here, Agent Iglesias approached Ramirez-Cifuentes as she stood in the taxi line. He identified himself as a federal drug agent and showed his badge. Speaking to her in Spanish, he determined that she had come from Miami. He then asked to see her ticket. She produced a one-way ticket in the name of "Rosa Gomez" that had been paid for in cash. Next, he asked her where she lived and her name. Still suspicious, he asked to see her identification papers. When she said she had left them all at home, he asked her if she would step off the taxi line with him. After stepping to one side with Iglesias, Ramirez-Cifuentes consented to a search of her bag, in which the agent found cocaine. He then arrested her. At all times, Iglesias spoke in a conversational tone and behaved courteously. The issue presented is whether the defendant's liberty was so restrained prior to her arrest as to invoke the Fourth Amendment's ban against unreasonable seizures. I would hold that she was not "seized" until Iglesias placed her under arrest.

I do not doubt that Ramirez-Cifuentes felt constrained to respond to the questions posed by Agent Iglesias. An illegal alien, carrying narcotics, it would be surprising if she were not overawed by the agent. However, I do not think that the test should turn on the individual and idiosyncratic reactions of the myriad suspects that law enforcement agents approach with requests for information. Not only would such a test place an impossible burden on the agent to divine the mind of each such suspect, it would permit defendants to appear to cooperate voluntarily and later testify that they did so out of fear. *See* 3 W. LaFave, Search and Seizure § 9.2(g), at 52 (1978). Thus, the test of whether an individual's liberty has been restrained must be an objective one—and Justice Stewart's formulation of whether a reasonable man, innocent of any crime, would feel free to leave seems most appropriate.

It is true that most individuals do cooperate when asked for information by law enforcement agents. L. Tiffany, D. McIntyre, & D. Rotenberg, The Detection of Crime 59 (1967). Certainly, when Drug Enforcement Administration agents approach airline passengers for questioning, few, if any, refuse to cooperate. Note, *Reformulating Seizures—Airport Drug Stops and the Fourth Amendment*, 69 Calif.L.Rev. 1486, 1501 (1981). However, I cannot accept the argument that no reasonable person would ever feel free to walk away from a law enforcement agent who displays his badge and seeks to ask some questions. *E.g.*, Preiser, *Confrontations Initiated By the Police on Less Than Probable Cause*, 45 Alb.L.Rev. 57, 81 (1980). There are many reasons why people choose to "stop and answer police questions . . . including a willingness to cooperate with police, a fear of police, a belief that a refusal to cooperate will result in arrest, or a combination of all three." L. Tiffany, D. McIntyre & D. Rotenberg, *supra*, at 17. *See also* Note, *supra*, at 1499–1501. I believe that reasonable men, innocent of any crime, are motivated more by the spirit of voluntary cooperation and a sense of moral duty than by fear.

The moral obligation to cooperate with law enforcement agencies in the pursuit of crime has roots deep in our history. The duty of free citizens to respond to the "hue and cry" and pursue wanted criminals goes back to the Assizes of Clarendon (1166) and the Statute of Winchester (1285). *See* 1 W. Holdsworth, A History of English Laws 292

(3d ed. 1922). The failure to reveal a felony to the authorities was a crime at common law, misprision of a felony, 3 W. Holdsworth, A History of English Laws 389 (3d ed. 1923), and is still a misdemeanor in England, G. Williams, Criminal Law 423–27 (2d ed. 1961). *See also* Judges' Rules, Home Office Circular No. 31/1964 ("citizens have a duty to help a police officer to discover and apprehend offenders"), *reprinted in* American Law Institute, A Model Code of Pre-Arraignment Procedure, Appendix VI, at 650 (1975). In the United States, misprision of a felony has been on the statute books since the first Congress. The statute, as amended, punishes with up to three years imprisonment "Whoever, having knowledge of the actual commission of a felony ... conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States...." 18 U.S.C. § 4 (1976). Although the legal duty to come forward with knowledge or evidence of crime has been undermined by the requirement of an act of concealment, *Bratton v. United States*, 73 F.2d 795 (10th Cir. 1934), the moral "obligation of all citizens to aid in enforcing the criminal laws," *Miranda v. Arizona*, 384 U.S. 436, 481, 86 S.Ct. 1602, 1631, 16 L.Ed.2d 694 (1966), continues undiminished. *See Roberts v. United States*, 445 U.S. 552, 557–558, 100 S.Ct. 1358, 1363–64, 63 L.Ed.2d 622 (1980). *See also Gisske v. Sanders*, 9 Cal.App. 13, 98 Pac. 43, 44 (1908) ("The duty of every good citizen is, when called upon, to give all information in his power to the proper officers of the law as to persons connected with crime....").

The circumstances of these airport investigations make it even more urgent that citizens respond to police requests for assistance. Agents must act almost instantaneously to determine which, if any, of the scores of people arriving at the airport may be carrying illegal drugs. The selection of suspects involves intuition, a sixth sense developed from experience in numerous similar situations. However, agents are not infallible. It is obviously critical that they not waste their time following or chasing innocent people. When innocent people are contacted by agents and asked a few simple questions that can quickly exculpate them, and free the agents to go about their urgent business, I cannot imagine that a reasonable man, mindful of his duties as a citizen, would be less than happy to cooperate. Where such intrusion is conducted in a civil and decent manner, it is not too high a price to pay for attempts by the government to control rampant criminal activity in the distribution of narcotics.

However, the spirit of cooperation has limits. As long as the officer's demeanor and questioning is within the bounds of what is normally accepted in social intercourse, it is reasonable to presume that the citizen's cooperation is willing and voluntary. But when the law enforcement agent adopts a menacing posture or makes requests that would be threatening or offensive if done by another private citizen, that presumption becomes less tenable. *See State v. Harlan*, 301 N.W.2d 717 (Iowa 1981). As Prof. LaFave puts it, the inquiry should be "whether the policeman, although perhaps making inquiries which a private citizen would not be expected to make, has otherwise conducted himself in a manner consistent with what would be viewed as a nonoffensive contact if it occurred between two ordinary citizens." 3 W. LaFave, *supra*, § 9.2(g), at 53.

Applying these principles here, I would find that Ramirez-Cifuentes was not "seized" until Agent Iglesias placed her under arrest. He walked alongside her as she progressed in the taxi line, and asked her politely in Spanish her name and home and if he could see her ticket receipt and identification. Surely, an innocent passenger in her position would have been happy to comply with the agent's requests. Cooperation entailed no delay and no more inconvenience than any social conversation. A closer question is whether the defendant was "seized" when the agent asked her if she would mind stepping off the taxi line so that they could converse without interference. Clearly, if Iglesias were a friend who had asked Miss Ramirez-Cifuentes to step

aside in order to continue a conversation, her acquiescence could in no way be construed as a restraint on her freedom of movement. Here, Iglesias did nothing that a private citizen could not do. He did not assert any right or authority over Miss Ramirez-Cifuentes; he did not touch her or menace her in any way; and his tone of voice was polite and conversational. He asked her to do nothing extraordinary or offensive. The delay caused by stepping aside was minimal, no more than would be expected in a social setting. Accordingly, I would hold that this request did not constitute a "seizure" under the Fourth Amendment.

After stepping off the taxi line with Agent Iglesias, the defendant consented to a search of her bags. That search disclosed 540 grams of cocaine and Agent Iglesias then clearly had probable cause to arrest her.

It is true that the test I would apply allows law enforcement agents greater latitude in approaching persons and questioning them. Citizens innocent of any illegal activity cannot reasonably complain of such intrusion and interruption. It is necessary for the maintenance of a free society that all those who enjoy it must be prepared to assist the appointed officers of the law in their investigation of illegal activity. Of course, if law enforcement agents use street interrogations to harass citizens, such improper activities must be curbed. However, the inadequate resources of investigative personnel are unlikely to be wasted questioning those for whom there is no basis for belief that questioning will be fruitful. Moreover, to circumscribe street or airport questioning by holding it to be a "stop" subject to the Fourth Amendment would seriously hobble legitimate inquiries by law enforcement agents. The approach proposed by Justice Stewart is in my opinion the proper solution to the problem of balancing the individual interest in freedom from state interference and the public interest in the discovery and punishment of crime.