**UNITED STATES of America,**

v.

**Francisco SANTIBANEZ GARCIA, Miguel Lopez Flores, Defendants.**

**No. 6:99–cr–61–ORL–18C.**

United States District Court, M.D. Florida, Orlando Division.

Nov. 15, 2000.

---

Peggy Ronca, Karen Cox, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Ana Escobar, Kevin P. Whitmore, U.S. Attorney's Office, Middle District of Florida, Orlando, FL, for United States.

Darlene M. Geiger, Federal Public Defender's Office, Orlando, FL, for Francisco Santibanez Garcia.

J. Manuel Acevedo, Law Office of J. Manuel Acevedo, Sanford, FL, for Miguel Lopez–Flores.

## ORDER

G. KENDALL SHARP, Senior District Judge.

Defendants Garcia and Flores move to suppress fourteen (14) pounds of methamphetamine discovered on their persons by the DEA[1] at the Orlando airport. (Docs. 24 & 25.) The government has responded in opposition (Doc. 29), the Court has conducted an evidentiary hearing, and the parties have filed proposed findings of fact and conclusions of law. (Docs. 85, 88 & 89.) Defendants' motions are **DENIED.**

### I. FINDINGS OF FACT

At hearing, the parties offered conflicting evidence on several key factual issues. "It is clear that credibility determinations and the resolution of conflicting testimony at a suppression hearing are the responsibility of the district court as trier of fact." *United States v. Turner,* 628 F.2d 461, 465 (5th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981); *United States v. Suggs,* 755 F.2d 1538, 1542 (11th Cir.1985). Having observed the witnesses and measured their credibility, the Court finds as follows:

#### A. The Arrival

Defendants contracted with an unnamed person to courier drugs from California to Florida. (*Hearing Transcript,* Doc. 84 at 40, 48–49, & 67–68.) On 1 March 1999, Defendants donned rubber waistbands packed with seven (7) pounds of methamphetamine (each) and headed for the Los Angeles airport. (*Id.* at 48–49.) Carrying $140,000 worth of methamphetamine between them, Defendants boarded United Airlines Flight 92 and arrived in Orlando,

---

1. Drug Enforcement Administration.

Florida, at 5:30 a.m. on 2 March 1999. (*Id.* at 3–5, 15 & 39.) This overnight flight is commonly known as the "red eye." (*Id.* at 4.)

That morning, DEA Agents Orochena and McMicking established drug courier surveillance at the Orlando International Airport. (*Id.* at 3–5.) Wearing plain clothes, the agents posted at Flight 92's receiving gate because Los Angeles is a reputed source city for drugs, because the "red eye" is a flight of choice for drug couriers, and because the DEA has intercepted multiple drug couriers arriving on Flight 92. (*Id.;* Doc. 29 at 2.)

The agents observed Defendant Garcia enter the terminal carrying a small bag. (*Id.* at 6–7, 40, & 62.) Several passengers later, Defendant Flores emerged carrying no luggage. (*Id.*) Defendants walked towards the airport tram quickly, separately, and nervously, looking back over their shoulders numerous times. (*Id.* at 7–8, 36.) From plane to tram, Defendants neither approached nor communicated with each other. (*Id.*)

When the tram arrived, Defendants entered the same car, approached each other for the first time, and began conversing. (*Id.* at 8–9, 27, 29, 62 & 68.) Defendants appeared "real friendly" and conversed all the way to the main concourse. (*Id.* at 29, 36.) Upon arrival, Defendants exited the tram together, by-passed baggage claim,

and walked towards the departing passenger entrance (as opposed to the arriving passenger exit located downstairs).[2] (*Id.* at 9–10, 28 & 30.) Nearing the door, Defendants hastened their pace and "appeared to be looking behind them and looking for other individuals." (*Id.* at 9–10.) Defendants exited the main concourse and walked towards the taxis. (*Id.* at 11, 40.)

### B. The Encounter

During his ten (10) year DEA career, Agent Orochena has investigated more than fifty (50) airport drug smuggling cases. (*Id.* at 3.) Trusting his experience, Agent Orochena concluded that Defendants "could be possible narcotics carriers[.]" (*Id.* at 11.) As a result, Agent Orochena approached Defendant Garcia and showed his badge. (*Id.* at 11–12, 32–33 & 41.) Speaking in Defendants' native language (Spanish), Agent Orochena identified himself as a DEA agent assigned to the narcotics unit. (*Id.*)

Though not approached, Defendant Flores stopped near Defendant Garcia. (*Id.* at 12, 33 & 63–64.) Agent McMicking, who does not speak Spanish, "stayed to the side" of the encounter to avoid the appearance of force.[3] (*Id.* at 11, 30–31 & 33.) Neither agent physically touched Defendant Flores or requested his identifica-

---

**2.** According to Agent Orochena, "[o]n this particular flight, particularly from Los Angeles, most of the passengers do go to the downstairs to the second level and pick up their luggage and either pick up a taxi or have family or friends pick them up." (*Id.* at 10–11.)

**3.** The Court is mindful of the discrepancies between Agent Orochena's hearing testimony and the DEA Report of Investigation. (*See generally* Doc. 84 at 17–22, 36–37.) When asked to explain, Agent Orochena stated that a new agent, Agent Schrant, "wrote the report because it was his initial days at the airport and the supervisor wanted him to get some experience." (*Id.* at 17.) Agent Schrant was not present when Defendants were arrested and completed the report based on Agent Orochena's statements. (*Id.* at 17–

18.) Inspection reveals that Agent Orochena did not sign the report, and no evidence suggests that he edited, reviewed, or approved Agent Schrant's final report.

Prior to testifying at hearing, Agent Orochena refreshed his recollection by speaking with Agent Schrant and reviewing his report. (*Id.* at 18.) If Agent Orochen were so inclined, he could have molded his testimony to match Agent Schrant's report. Observation proved Agent Orochena highly credible and the Court accepts as true his discrepancy explanation and testimonial sequence of events. *See United States v. Ramos*, 933 F.2d 968, 969 (11th Cir.1991) (per curiam) (affirming district court's resolution of factual uncertainties caused by conflicting reports and testimony of three DEA agents.)

tion.[4] (*Id.* at 31, .32–33, 46, 57–58 & 64–65.) Both Defendants appeared very nervous and began shaking. (*Id.* at 13.)

Speaking only to Defendant Garcia, Agent Orochena asked, "in Spanish very politely," if Defendant Garcia would speak with him. (*Id.* at 12, 32 & 54.) Defendant Garcia consented. (*Id.* at 56–7.) Agent Orochena then requested, inspected, and returned Defendant Garcia's identification and airline ticket.[5] (*Id.* at 12, 23–24 & 41.)

Upon returning Defendant Garcia's documentation, Agent Orochena asked whether Defendant Garcia "had any contraband or weapons or anything on him, if he had any drugs." (*Id.* at 13.) Defendant Garcia said no. (*Id.*) Agent Orochena then requested consent to search Defendant Garcia's bag. (*Id.* at 13, 43.) Defendant Garcia consented and Agent Orochena found nothing. (*Id.*) Defendant Garcia continued to exhibit extreme nervousness. (*Id.* at 14.)

Next, Agent Orochena requested consent to search Defendant Garcia's person.[6] (*Id.* at 13–14, 21.) Again, Defendant Garcia consented. (*Id.* at 14; Doc. 83 at 1, 3, 4, 6, 9 & 11.) Agent Orochena searched Defendant Garcia's person, discovered his hidden waistband (and its contents), and placed him under arrest. (*Id.* at 14–15.)

Throughout this encounter, Agent Orochena spoke in Defendants' native language, acted politely at all times, and never restrained Defendant Garcia "in any way" before arresting him. (*Id.* at 54–55.) Agent Orochena never told Defendant Garcia he was not free to leave, (*Id.* at 54),

and Defendant Garcia testified that he "didn't have any reason to flee" from Agent Orochena, (*Id.* at 53), notwithstanding his concealed contraband.

After arresting Defendant Garcia, Agent Orochena "looked at" Defendant Flores, noticed that he too was "extremely nervous," and observed him "reach in his crotch area." (*Id.* at 15.) "*Where [is] it?*," asked Agent Orochena. (*Id.* at 15, 72.) In response, Defendant Flores stated, "*You know where it's at.*" (*Id.* at 15–16.) Agent Orochena then searched Defendant Flores' person, discovered his hidden waistband (and its contents), and placed him under arrest. (*Id.* at 16.; Doc. 83 at 2, ¶ 5.)

## II. LAW

Eleventh Circuit precedent demarcates three (3) types of police-citizen encounters: consensual encounters, *Terry* stops, and full-scale arrests.

### A. Consensual Encounters

Consensual encounters between police officers [7] and citizens do not trigger Fourth Amendment safeguards. *See Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Florida v. Royer*, 460 U.S. 491, 497–99, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Indeed, "[t]he Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382. Hence, no Fourth Amendment seizure occurs when an officer elicits a citizen's vol-

---

**4.** Observation proved Defendant Flores' testimony not credible, including his claim that Agent McMicking held his arm during Agent Orochena's encounter with Defendant Garcia. (*See Id.* at 63–64 & 72.)

**5.** Observation also proved Defendant Garcia's testimony not credible, including his claim that Agent Orochena failed to return his documentation. (*See Id.* at 42, 50 & 53.)

**6.** At hearing, Defense Counsel emphasized that paragraph four of the DEA Report does not expressly state that Agent Orochena asked

permission to search Defendant Garcia's person. (*Id.* at 20–21.) Nevertheless, the report repeatedly states that the evidence was located pursuant to a consensual search of Defendant's person, (*See* Doc. 83 at 1, 3, 4, 6, 9 & 11), and Agent Orochena testified credibly to the same. (*Id.* at 21.)

**7.** Throughout this order, the Court uses the terms "police officer" and "officer" to represent law enforcement officers in general, federal and state alike.

untary cooperation through non-coercive questioning. *United States v. Armstrong*, 722 F.2d 681, 684 (11th Cir.1984).

Supreme Court precedent holds that "as long as the police do not convey a message that compliance with their requests is required," officers may ask questions of an individual, ask to examine the individual's identification, and request consent to search the individual's person and baggage. *Bostick*, 501 U.S. at 435, 437, 111 S.Ct. 2382 (citations omitted).

To distinguish between consensual encounters and Fourth Amendment seizures, the Court considers "all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439, 111 S.Ct. 2382. The person's subjective state of mind is irrelevant; an innocent person is presupposed. *Id.* at 438, 111 S.Ct. 2382.

█ Relevant surrounding circumstances include: 1) location of the encounter (private versus public); 2) numerous, threatening officers present; 3) uniformed officers present; 4) the display of weapons; 5) physical touching; 6) language or tone of voice indicating that compliance with the officer's request might be compelled; 7) physical blocking of the suspect's path; 8) retaining the suspect's documentation for an inordinate amount of time; 9) suggesting investigatory focus on the suspect; 10) suggesting that failure to cooperate or refusal of consent to search shall indicate guilt; 11) failing to inform the suspect that cooperation is voluntary, consent may be refused, and an attorney may be consulted; 12) requesting the suspect to relocate to a private room while retaining the suspect's documentation; 13) the suspect's age, education, and intelligence; and 14) the overall length of the encounter.[8]

"In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555, 100 S.Ct. 1870. Illustrations are many, but two, specially apposite, may be selected from the mass. *United States v. Armstrong*, 722 F.2d 681, 684 (11th Cir. 1984), and *United States v. Jensen* 689 F.2d 1361 (11th Cir.1982) (per curiam), involved consensual airport encounters not within the purview of the Fourth Amendment.

In *Jensen*, as here, a DEA agent approached defendant, showed his badge, identified his official capacity, and obtained defendant's consent to talk. 689 F.2d at 1362. Upon request, defendant produced his identification and ticket. *Id.* Upon returning defendant's documentation, the agent stated, "we're narcotics officers, and we're looking for drugs and narcotics at the airport. Are you carrying any drugs or narcotics either on your person or in your luggage?" *Id.* Defendant said no. *Id.*

Next, the agent requested consent to search defendant's suitcase and person. *Id.* Defendant "responded by requesting that they go somewhere and talk." *Id.* The agent agreed, and, while walking, asked what defendant wanted to talk about. *Id.* "You know," replied Defendant. *Id.* When the agent asked whether defendant meant drugs, defendant replied, "You already know." *Id.* Thereafter, the agent escorted defendant to a private office, read

---

**8.** *See generally Florida v. Royer*, 460 U.S. at 501–02, 103 S.Ct. 1319; *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Blake*, 888 F.2d 795, 798–99 (11th Cir.1989); *United States v. Armstrong*, 722 F.2d 681, 685 (11th Cir.1984); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir.1984); *United States v. Waksal*, 709 F.2d 653, 659 (11th Cir.1983); *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982); and *United States v. Berry*, 670 F.2d 583 (5th Cir.1982) (en banc) (presplit).

his Miranda rights, and told defendant he could refuse to consent to a search of his luggage. *Id.* Defendant consented in writing and the agent discovered cocaine inside his luggage.[9] *Id.*

Appealing the denial of his motion to suppress, defendant took the position that an unlawful Fourth Amendment seizure occurred as soon as the agent requested consent to search defendant's luggage during the initial encounter. *Id.* at 1362–63. In support, defendant argued that "after being asked for documents and identification, being told that the person questioning him was a narcotics agent, being asked whether he was carrying drugs, and being asked to consent to a search, no person would have felt free to leave." *Id.*

The Eleventh Circuit disagreed: the agent's "statements would not have indicated to a reasonable person that he had become the specific focus of an investigation or that failure to cooperate would lead only to formal detention." *Id.* Given that the agent never suggested defendant was lying, the agent's request for consent to search "would have merely appeared to a reasonable person to have been an attempt to obtain confirmation of denials of drug-smuggling activity, not an accusation that the denials were lies, and hardly would have indicated that that person no longer was free to leave if he wished." *Id* at 1364. No Fourth Amendment seizure, no suppression. *Id. See also INS v. Delgado,* 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (no seizure where employees had "no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer.")

Two years after *Jensen,* the Eleventh Circuit held that no Fourth Amendment seizure occurs when an officer elicits a citizen's voluntary cooperation through non-coercive questioning. *Armstrong,* 722 F.2d at 684. There, an officer decided to question defendant (and his traveling companion) after observing their nervous behavior and defendant's "large amount of cash." *Id.* at 682. The officer approached both men, identified his official capacity, and asked to speak with them. *Id.* Both men consented and the officer requested and inspected their identifications and tickets.[10] *Id.*

Next, the officer requested consent to search defendant's luggage. *Id.* Defendant refused and sought permission to call his father, a police lieutenant. *Id.* The officer assented and "told both men that they were not in custody and could go wherever they wished." *Id.* Call completed, defendant again refused consent and boarded his flight to Atlanta, Georgia, where he was later arrested under circumstances not particularly relevant here. *Id.* at 683.

Appealing the denial of his motion to suppress, defendant took the position that his initial encounter with the officer "was a seizure of his person which could be justified only by 'reasonable suspicion' of criminal activity, which the officer lacked." *Id.* Relying on the factors set forth above, the Eleventh Circuit disagreed, concluding "without question" that the encounter "was merely a contact, outside the realm of fourth amendment protection." *Id.* at 684.

In so concluding, the court noted that the encounter took place in the public concourse, the officer wore plain clothes and never displayed his weapon, no physical contact occurred, the officer "requested, but did not demand to see" defendant's documentation, and the officer informed defendant he was free to leave and could refuse consent to search. *Id.* Considering the totality of circumstances, defendant had no "objective reason to believe that he

---

9. It is unclear whether the agent conducted a search incident to arrest of defendant's person.

10. Because defendant failed to assert any facts showing that the officer "kept both pieces of identification while continuing to interrogate him," *Id.* at 685, defendant, as the moving party, failed to satisfy his "burden of establishing the facts needed for a suppression of evidence[.]" *Id.*

was not free to end the conversation in the concourse and proceed on his way." *Id.* Hence, defendant's Fourth Amendment rights were neither triggered nor violated. *Id.* at 684–85.

### B. Terry Stops

The Fourth Amendment permits an officer to stop and briefly detain a person for investigative purposes if the officer has a reasonable, specific, and articulable suspicion that criminal activity is afoot. *Terry v. Ohio,* 392 U.S. 1, 21–23, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In legal parlance, such seizures are known as a *"Terry* stops." *See United States v. Puglisi,* 723 F.2d 779, 784 (11th Cir.1984).

"The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000); *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). For example, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow,* 120 S.Ct. at 676. *See United States v. Berry,* 670 F.2d 583 598 (11th Cir.1982).

In assessing whether an officer's suspicion was reasonable under the circumstances, the Court remains mindful that trained officers can "perceive and articulate meaning in given conduct which would be wholly innocent to the untrained eye." *Mendenhall,* 446 U.S. at 563, 100 S.Ct. 1870 (citation omitted). As a result, officers are entitled to assess the facts in light of their experience and rely on knowledge of criminal methods and characteristics of persons engaged in such criminal activities (e.g., evading police contact). *Id.* In the final analysis, "a reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Gordon,* 231 F.3d 750, 754 (11th Cir.2000).

In the course of a *Terry* stop, an officer may "conduct a carefully limited search of the outer clothing of [the suspect's] clothing in an attempt to discover weapons which might be used to assault him." *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Before frisking for weapons, however, an officer must reasonably believe the suspect is armed and dangerous. *Id.* at 27, 30, 88 S.Ct. 1868. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. 1868. Again, the Court gives due weight "to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." *Id.; see also Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("police officer views the facts through the lens of his police experience and expertise.")

### C. Arrests

The Fourth Amendment "permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (citations omitted). Probable cause "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 37, 99 S.Ct. 2627 (citations omitted); *Terry* 392 U.S. at 26, 88 S.Ct. 1868. As with reasonable suspicion, "a police officer may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas,* 517 U.S. at 700, 116 S.Ct. 1657.

In the context of airport arrests, the Eleventh Circuit has found probable cause based upon a suspect's incriminating statements and "unusual bulges." *See, e.g.,*

*United States v. Elsoffer,* 671 F.2d 1294, 1298 (11th Cir.1982) (where "unusual bulge" in airport suspect's pants "alone provided not only reasonable suspicion but also probable cause for [suspect's] arrest."); *United States v. Mancini,* 802 F.2d 1326, 1329 (11th Cir.1986) (where officer requested consent to search and suspect responded, *"What happens if I do have drugs?,"* officer reasonably inferred from statement that suspect was carrying drugs and therefore probable cause to arrest existed); *Jensen,* 689 F.2d 1361 (where officer asked whether suspect was carrying drugs and suspect responded, *"You Know,"* and, *"You already know,"* officer lawfully escorted suspect to private office, read his Miranda rights, and requested consent to search).

### III. APPLICATION

#### A. Defendant Garcia

█ Defendant Garcia was not subjected to a Fourth Amendment seizure because a reasonable, innocent person in Defendant Garcia's position would have no objective reason to believe he was not free to end the conversation with Agent Orochena and proceed on his way. No seizure, no Fourth Amendment safeguards, no suppression.

First, the encounter took place in the public concourse, not a private office. Second, Agent Orochena acted politely at all times, never restrained Defendant Garcia in any way, and never stated that Defendant Garcia was not free to leave. Third, both agents wore plain clothes, not uniforms. Fourth, neither agent displayed a weapon. Fifth, Agent Orochena politely approached Defendant Garcia instead of summoning Defendant Garcia to his presence. Sixth, Agent Orochena politely asked permission to speak with Defendant Garcia; he did not simply launch into an interrogation. Seventh, Agent Orochena requested (but did not demand to see) Defendant Garcia's identification and ticket, which he immediately returned. Eighth, Agent Orochena never suggested Defendant Garcia was the focus of an investigation. Ninth, Agent Orochena never suggested Defendant Garcia's failure to cooperate or refusal of consent would indicate guilt. Tenth, Agent Orochena never asked Defendant Garcia to relocate to a private room while retaining his documentation. And finally, before the consensual search took place, neither agent physically touched Defendant Garcia or forcefully blocked his path.

Defendant Garcia failed to assert any facts establishing whether or not Agent Orochena informed Defendant Garcia that his cooperation was voluntary, he *was* free to leave, he could refuse consent to search, and he could consult an attorney. At hearing, Defendant Garcia merely testified that Agent Orochena never stated that he *was not* free to leave. Additionally, Defendant Garcia failed to establish whether the encounter was inordinately lengthy. Thus, the evidence weighing in favor of finding that a Fourth Amendment seizure occurred is limited to the fact that Defendant Garcia has but a third grade education and "has always worked in the field." (Doc. 84 at 39.)

Considering the totality of circumstances, the Court finds that no Fourth Amendment seizure occurred because Agent Orochena merely elicited Defendant Garcia's voluntary cooperation through polite, non-coercive questioning. Further, the government has carried its burden to show that Defendant Garcia freely and voluntarily consented to a search of his bag and person.[11] Accordingly, Defendant

---

**11.** *See United States v. Blake,* 888 F.2d 795, 798 (11th Cir.1989) ("The government bears the burden of proving both the existence of consent and that the consent was not the function of acquiescence to a claim of lawful authority but rather was given freely and vol- untarily.") Assuming arguendo that Defendant was unaware that consent could be refused, the Court's conclusion is not altered under the totality of circumstances. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (volun-

Garcia's motion to suppress must be denied.

### B. Defendant Flores

■ Before and until Defendant Garcia was arrested, no encounter occurred between the agents and Defendant Flores, consensual or otherwise. Defendant Flores voluntarily stopped and waited while his friend and traveling companion participated in a consensual encounter with Agent Orochena. After Defendant Garcia's arrest, however, Agent Orochena looked at Defendant Flores, observed him reaching in his crotch area, and bluntly asked *"Where is it?"* At this point, the Court finds that a reasonable person in Defendant Flores' position would not have felt free to ignore Agent Orochena's presumptive, accusatory question and proceed on his way. The point is purely academic, however, because Agent Orochena had reasonable, specific, and articulable suspicion sufficient to justify a *Terry* stop.

First, Agent Orochena is a highly experienced agent with more than fifty (50) drug smuggling cases under his belt. Second, Defendant Flores arrived from a reputed source city for drugs on the "red eye" flight. Third, the agents observed Defendant Flores' participation in the airport charade, wherein he and Defendant Garcia evolved from total strangers to friends and traveling companions. Fourth, Defendant Flores appeared extremely nervous while traversing the airport, looking back over his shoulder numerous times. Fifth, despite traveling cross-country, Defendant Flores carried no luggage, completely by-passed luggage claim, and quickly headed for the nearest exit, albeit the wrong exit. Sixth, Defendant Flores appeared extremely nervous during and after Agent Orochena's encounter with Defendant Garcia. Seventh, Agent Orochena discovered concealed contraband on Defendant Flores' traveling companion. And finally, after arresting Defendant Garcia,

Agent Orochena looked at Defendant Flores and noticed him reach in his "crotch area," the same general anatomical area that Defendant Garcia's waistband was found.[12]

Viewing the totality of circumstances, with due respect for common sense and Agent Orochena's skill and experience, the Court finds that Agent Orochena had reasonable suspicion to believe that Defendant Flores was engaged in drug smuggling. Thus, under *Terry*, Agent Orochena was justified in briefly detaining and questioning Defendant Flores.

The detention was indeed brief, consisting of just one question and one answer. Agent Orochena asked, *"Where is it?,"* and, fully aware that *"it"* meant drugs, Defendant Flores replied *"You know where it is."* And he was right.

When stacked upon the factors giving rise to reasonable suspicion, the Court finds that Defendant Flores' highly incriminating gesture and statement would cause a reasonably cautious officer with Agent Orochena's experience to reasonably infer that Defendant Flores was smuggling drugs. To be sure, Defendant Flores' directly responsive and location specific statement is at least as incriminating as the defendants' statements giving rise to probable cause in *Jensen, supra,* (*"You already know"*), and *Mancini, supra,* (*"What happens if I do have drugs?"*), and clearly more incriminating than the suspect's "unusual bulge" in *Elsoffer, supra.* Accordingly, the Court finds that Agent Orochena had probable cause to arrest Defendant Flores for drug smuggling and properly conducted a search incident to arrest leading to the discovery of the subject evidence.

This conclusion in no way runs afoul the proscription that "a person's mere propinquity to others independently suspected of

---

tariness of consent does not turn on knowledge of right to refuse consent).

**12.** The last two facts decisively distinguish *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam).

criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). The search of Defendant Flores' person was supported by probable cause particularized with respect to Defendant Flores, not by his "mere propinquity" to Defendant Garcia.

Nor does it matter that Agent Orochena searched Defendant Flores' person prior to arresting him. Given that formal arrest followed "quickly on the heels" of the search of Defendant Flores' person, it is not particularly important that the search preceded the arrest rather than vice versa. *See Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (if probable cause exists before search, then immaterial if search precedes contemporaneous arrest); *Elsoffer,* 671 F.2d at 1298 n. 8.

Because the subject evidence was discovered during a lawful search of Defendant Flores' person, the Court need not decide whether Defendant Flores voluntarily consented to the search.[13] Accordingly, Defendant Flores' motion to suppress must be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions to suppress (Docs. 24 & 25) are hereby **DENIED.**

**DONE AND ORDERED.**

---

13. *See United States v. Quinones–Sandoval,* 943 F.2d 771, 774 (7th Cir.1991) (defendant voluntarily consented to search when officer asked whether defendant had any drugs or guns in car and defendant replied, *"No, check it out."*) Compare (*"You know where it is."*)